FILED

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

2011 JAN 26  P 2: 54

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

*unsealed  2/7*

| | |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) | Misc. No. 10GJ3793 |

**ORAL ARGUMENT REQUESTED**


# MOTION OF REAL PARTIES IN INTEREST
## JACOB APPELBAUM, ROP GONGGRIJP, AND BIRGITTA JONSDOTTIR
## FOR UNSEALING OF SEALED COURT RECORDS AND
## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

3

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................................ii

**INTRODUCTION** ..........................................................................................1

**FACTUAL AND PROCEDURAL BACKGROUND** ...............................................3

   I.    MOVANTS .........................................................................................3

   II.   TWITTER ..........................................................................................4

   III.  THE DECEMBER 14, 2010 ORDER TO TWITTER. .......................................6

**ARGUMENT** .............................................................................................10

   I.    THE UNSEALING OF THE TWITTER ORDER REMOVES THE
        JUSTIFICATION FOR CONTINUED SEALING OF THE SEALED
        DOCUMENTS. ...................................................................................10

   II.   MOVANTS NEED THESE DOCUMENTS UNSEALED SO THAT
        THEY CAN PROTECT THEIR FUNDAMENTAL RIGHTS. ...........................11

   III.  BOTH THE COMMON LAW AND THE FIRST AMENDMENT
        SUPPORT A RIGHT OF ACCESS TO THE SEALED DOCUMENTS. ...........14

        A.   The Common Law Right Of Access Attaches To § 2703 Orders
            And Applications. .........................................................................15

        B.   The First Amendment Right Of Access Attaches To § 2703 Orders
            And Applications. .........................................................................18

        C.   The Government Cannot Meet Its Burden To Overcome The
            Presumption Of Access To The Sealed Documents. .............................21

**CONCLUSION** ...........................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Baltimore Sun Co. v. Goetz*, 886 F.2d 60 (4th Cir. 1989) .............................16, 19, 26, 27

*BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC,*
   303 F.3d 1332 (Fed. Cir. 2002) ...............................................................................16

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975)............................................13

*Franks v. Delaware*, 438 U.S. 154 (1978)......................................................................20

*FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404 (1st Cir. 1987)..................................21

*Grandbouche v. United States (In re First Nat'l Bank),*
   701 F.2d 115 (10th Cir. 1983) .................................................................................13

*Hartford Courant Co. v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004) ...................................27

*In re Sealing and Non-Disclosure of Pen/Trap/2703(d) Orders,*
   562 F. Supp. 2d 876 (S.D. Tex. 2008)......................................................................16

*In re Search Warrant for Secretarial Area Outside the Office of Thomas Gunn,*
   855 F.2d 569 (8th Cir. 1988) ..............................................................................17, 27

*Keene Corp. v. United States*, 508 U.S. 200 (1993) ......................................................17

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157 (3d Cir. 1993) ..............14

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. Waterfront Comm'n of N.Y.*
   *Harbor*, 667 F.2d 267 (2d Cir. 1981) ......................................................................14

*Mandel v. Bradley*, 432 U.S. 173 (1977)........................................................................13

*Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978).......................................14, 15, 21

*Pollard v. Roberts*, 283 F. Supp. 248 (E.D. Ark. 1968) (three-judge court),
   *aff'd per curiam*, 393 U.S. 14 (1968) ......................................................................13

*Press-Enterprise Co. v. Super. Ct. of Cal.*, 464 U.S. 501 (1984)
   *(Press-Enterprise I)* ...........................................................................................22, 25

*Press-Enterprise Co. v. Super. Ct. of Cal.*, 478 U.S. 1 (1986)
   *(Press-Enterprise II)*.......................................................................................19, 20, 21

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997)........................................6

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).......................................14

*Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249 (4th Cir. 1988)....................18, 22

*Russello v. United States*, 464 U.S. 16 (1983)................................................................18

*Seattle Times Co. v. U.S. Dist. Ct.*, 845 F.2d 1513 (9th Cir. 1988)................................19

*Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178 (4th Cir. 1988)...........16, 22, 26, 27

*Union Oil Co. v. Leavell*, 220 F.3d 562 (7th Cir. 2000)................................................15

*United States v. Chagra*, 701 F.2d 354 (5th Cir. 1983).......................................18, 19, 21

*United States v. Gonzales*, 150 F.3d 1246 (10th Cir. 1998)............................................19

*United States v. James*, 663 F. Supp. 2d 1018 (W.D. Wash. 2009) ................................10

*United States v. Klepfer (In re The Herald Co.)*, 734 F.2d 93 (2d Cir. 1984).................10

*United States v. Mentzos*, 462 F.3d 830 (8th Cir. 2006),
    *cert. denied*, 549 U.S. 1359 (2007)...........................................................................16

*United States v. Mitchell*, 551 F.2d 1252 (D.C. Cir. 1976),
    *rev'd on other grounds sub nom.*
    *Nixon v. Warner Commc'ns*, 435 U.S. 589 (1978)......................................................15

*United States v. Moussaoui*, 65 F. App'x 881 (4th Cir. 2003) ................................15, 26

*United States v. Rosen*, 487 F. Supp. 2d 703 (E.D. Va. 2007) ......................................16

*United States v. Simone*, 14 F.3d 833 (3d Cir. 1994) ....................................................19

*United States v. Soussoudis (In re Wash. Post Co.)*, 807 F.2d 383 (4th Cir. 1986) ........18

*United States v. U.S. Dist. Ct. (Keith)*, 407 U.S. 297 (1972)..........................................25

*United States v. Valenti*, 987 F.2d 708 (11th Cir. 1993) ...............................................27

*Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567 (4th Cir. 2004)....................22, 26

*Wash. Post Co. v. Hughes (In re Application & Affidavit for a Search Warrant)*,
    923 F.2d 324 (4th Cir. 1991) ................................................................................15, 25

*Wash. Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991)................................................18

**Statutes**

18 U.S.C. § 2518..................................................................................................17

18 U.S.C. § 2703..............................................................................................passim

18 U.S.C. § 2705...........................................................................................8, 18

18 U.S.C. § 3123..................................................................................................17

Electronic Communications Privacy Act of 1986 ("ECPA"),
   Pub. L. No. 99-508, 100 Stat. 1848 (1986) ...............................................24

**Other Authorities**

Barton Gellman, *Twitter, Wikileaks and the Broken Market for Consumer Privacy*,
   Time Magazine: Techland, Jan. 14, 2011, http://techland.time.com/2011/
   01/14/twitter-wikileaks-and-the-broken-market-for-consumer-privacy/ .................9, 12

Brad Stone & Noam Cohen, *Social Networks Spread Defiance Online*,
   N.Y. Times, June 16, 2009, at A11, *available at*
   http://www.nytimes.com/2009/06/16/world/middleeast/16media.html .........................5

David Batty, *US Orders Twitter To Hand Over WikiLeaks Members'
   Private Details*, The Guardian, Jan. 8, 2011 .................................................9

*ECPA Reform and the Revolution in Cloud Computing: Hearing Before the
   Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the
   H. Comm. on the Judiciary*, 111th Cong. (Sept. 23, 2010) .........................................25

Eric Schoenfeld, *How Big is Twitter Really?*, TechCrunch.com, April 16, 2010,
   http://techcrunch.com/2010/04/16/how-big-twitter/....................................................4

Ethan Zuckerman, *The First Twitter Revolution?*,
   Foreign Policy, January 14, 2010, *available at*
   http://www.foreignpolicy.com/articles/2011/01/14/
   the_first_twitter_revolution?page=full ..........................................................5

Glenn Greenwald, *DOJ Subpoenas Twitter Records of Several
   WikiLeaks Volunteers*, Salon.com, Jan. 7, 2011,
   http://www.salon.com/news/opinion/glenn_greenwald/2011/01/07/twitter ...............13

Jack Goldsmith, *Seven Thoughts on Wikileaks*, Lawfare Blog, Dec. 10, 2010,
   http://www.lawfareblog.com/2010/12/seven-thoughts-on-wikileaks/ .........................23

John Nichols, *Journalists Begin, Finally, To Stand Up in Defense of WikiLeaks and Freedom of Information*, The Nation: The Beat Blog, Dec. 14, 2010, http://www.thenation.com/blog/157106/journalists-begin-finally-stand-defense-wikileaks-and-freedom-information ................................................................23

Marc A. Thiessen, *Obama Administration Is Weak in the Face of WikiLeaks*, Wash. Post, Nov. 29, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/11/29/AR2010112902474.html. ...............................23

Miguel Helft & Claire Cain Miller, *1986 Privacy Law Is Outrun by the Web*, N.Y. Times, Jan. 10, 2011, at A1, *available at* http://www.nytimes.com/2011/01/10/technology/10privacy.html ...............................9

*Obama Calls WikiLeaks' "Deplorable,"* Reuters, Dec. 11, 2010, *available at* http://www.reuters.com/article/idUSTRE6BA24B20101211 ....................................23

OMB Watch, *In WikiLeaks' Wake, Administration Tightens Information Security*, Jan. 11, 2011, http://www.ombwatch.org/node/11452...............................................23

Paul Lanois, *Caught in the Clouds: The Web 2.0, Cloud Computing, and Privacy?*, 9 Nw. J. Tech. & Intell. Prop. 29 (2010) ....................................................................24

Pew Internet & American Life Project, , Twitter and Status Updating, Fall 2009 (Oct. 2009), *available at* http://www.pewinternet.org/~/media//Files/Reports/2009/ PIP_Twitter_Fall_2009web.pdf .................................................................................5

Pew Internet & American Life Project, Online Activities, 2000-2009, http://pewinternet.org/Static-Pages/Trend-Data/Online-Activities-20002009.aspx (last visited Jan. 21, 2011)........................................................................................24

President Barack Obama, Remarks After Bipartisan Leadership Meeting (July 27, 2010), *available at* http://www.whitehouse.gov/the-press-office/ remarks-president-after-bipartisan-leadership-meetinga...........................................23

Scott Shane & John F. Burns, *U.S. Subpoenas Twitter Over WikiLeaks Supporters*, N.Y. Times, Jan. 9, 2011, at A1, *available at* *http://www.nytimes.com/2011/01/09/world/09wiki.html* ...............................................9

Securing Human Intelligence and Enforcing Lawful Dissemination Act, · H.R. 6506, 111th Cong. (2010) ...................................................................................23

Securing Human Intelligence and Enforcing Lawful Dissemination Act, S. 4004, 111th Cong. (2010)........................................................................................23

*The Electronic Communications Privacy Act: Promoting Security and Protecting Privacy in the Digital Age: Hearing Before the S. Comm. on the Judiciary*, 111th Cong. (Sept. 22, 2010)....................................................................................24

v

*The Espionage Act and the Legal and Constitutional Issues Raised by WikiLeaks:*
   *Hearing Before the H. Comm. On the Judiciary*, 111th Cong. (Dec. 16, 2010) .........23

Twitter, Twitter Help Center – Guidelines for Law Enforcement,
   http://support.twitter.com/entries/41949-guidelines-for-law-enforcement
   (last visited Jan. 25, 2011) ........................................................................................8

# INTRODUCTION

Real parties in interest Jacob Appelbaum, Rop Gonggrijp, and Birgitta Jonsdottir ("Movants") respectfully move the Court for an Order unsealing court records concerning the United States government's attempt to obtain information about their electronic communications and publications. Specifically, Movants request the unsealing of: (1) all orders and documents filed in this matter before the Court's issuance of the December 14, 2010 Order requiring Twitter to provide information concerning Movants (the "Twitter Order"); (2) all orders and documents filed in this matter after issuance of the Twitter Order; (3) all similar judicial orders requiring entities other than Twitter to provide information concerning Movants' electronic communications and publications;[1] and (4) all documents filed in connection with such other orders or requests for such orders (collectively, the "sealed documents").

Movants request that all of the sealed documents be unsealed and made public as quickly as possible, with only those redactions essential to protect information that the Court determines, after independent review, to be properly withheld from public view. Alternatively, Movants seek leave to view the sealed documents under an appropriate protective order.

There is a presumption of access to judicial records like the sealed documents under both the common law and the First Amendment. The government cannot meet its heavy burden to overcome that presumption here for three reasons. First, because the Court has previously determined that Movants and the public can be made aware of the

---

[1] To the extent these other orders and documents are filed under separate docket numbers, Movants respectfully request that a copy of this motion be filed in the correct docket(s).

1

underlying investigation and the Twitter Order, no legitimate government interest, let alone a compelling interest, is served by continued sealing of the materials.

Second, Movants have an interest in learning about the government's attempts to obtain their records so that they can take steps to protect their constitutional rights. Although that interest could be overcome in some contexts, it cannot be overcome here. Movants have challenged the Twitter Order in a motion filed herewith, and intend to challenge any similar orders, warrants, or subpoenas to other companies (collectively, "§ 2703 orders"). Absent disclosure of the sealed documents, Movants will not be able to challenge these other § 2703 orders, and their ability to challenge the Twitter Order will be significantly curtailed.

Finally, these sealed materials are of immense public interest to the ongoing debate about the legality of WikiLeaks' publication of previously unpublished information concerning the U.S. government's activities, and their disclosure would significantly serve the public interest. Unsealing the documents would also increase the public's ability to participate meaningfully in a separate, but equally important, debate about the proper balance in the digital age between the right to privacy and law enforcement needs.

The Court has already held that unsealing the Twitter Order was "in the best interest" of the government's investigation. In these circumstances, both the common law and First Amendment right of access to judicial records mandate that these documents be unsealed.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.      MOVANTS.**

Birgitta Jonsdottir is an elected Member of the Parliament of Iceland, representing the Reykjavik South Constituency. Ms. Jonsdottir was elected in 2009 to serve a four-year term, ending in 2013. Ms. Jonsdottir uses Twitter.com ("Twitter") as a method for communicating to her constituency and to publish her thoughts and links to information she has seen on the Internet to individuals around the world interested in her views and her political and professional activities. She used Twitter as part of her political campaign for Parliament and, since her election, has used it to publish "tweets" about her political positions, activities, and work as a Member of Parliament. She has published over 1,000 tweets since November 2009. She has written the majority of those messages in Icelandic, with the remainder in English.

Jacob Appelbaum is a computer security researcher and photographer who is a U.S. citizen. Mr. Appelbaum is well known in the U.S. and abroad as an expert in computer and telecommunications security, especially because of his work with the "Tor" project developing encryption software that allows individuals, businesses, activists, the media, law enforcement, and the U.S. military to protect their privacy and security on the Internet. Mr. Appelbaum regularly uses Twitter to post public messages through his Twitter account, "ioerror." As of January 25, 2010, public Twitter records show that Mr. Appelbaum has posted 7,920 Tweets and has 10,757 followers. Mr. Appelbaum's tweets cover numerous topics, including Internet censorship, human rights issues, Internet security, and other commentaries on political and social issues in the U.S. and abroad.

3

Rop Gonggrijp is a Dutch activist and businessman. He is the founder or co-founder of several companies, including XS4ALL, the Netherlands' first public Internet service provider; ITSX, a computer security evaluation company; and Cryptophone, a company that produces mobile telephones with end-to-end encryption. Mr. Gonggrijp is well known in the Netherlands and abroad as an expert in computer and telecommunications security. He has regularly been an expert witness in court, and is a guest lecturer on the Information Revolution and its political impact. Mr. Gonggrijp uses Twitter to post public messages through his blog, http://rop.gonggri.jp/.

Although Movants are unrelated individuals, with different perspectives and stories, they file this motion together in the interest of judicial economy, because each of them is concerned about the government's efforts to obtain private, protected information about their and other individuals' communications, and because each of them believes that this invasive governmental action, if permitted at all, must be undertaken transparently.

## II.    TWITTER.

Twitter is an online micropublishing tool that permits individuals to communicate with an infinite number of other people around the world, on whatever subject the "tweeter" desires, in messages of 140 characters or less. Twitter is one of the fastest growing forms of communication in the world, with over 175 million reported registered users as of September 2010 – including individuals, corporations, governmental entities, and elected officials. By some estimates it is the eleventh largest website in the world.[2]

---

[2] Eric Schoenfeld, *How Big is Twitter Really?*, TechCrunch.com, April 16, 2010, http://techcrunch.com/2010/04/16/how-big-twitter/; *see also* Pew Internet & American Life Project, Twitter and Status Updating, Fall 2009 (Oct. 2009), *available at*

Twitter has been an especially vital form of communication for individuals who either do

not have means of access to more traditional media or who live in repressive societies

where freedom of speech is not protected, most recently in Iran and Tunisia.[3]

To publish material on Twitter, an individual needs to sign up for a Twitter

account. Once that account is opened, a subscriber can publish messages using the

account ("tweets"), sign up to receive others' tweets (those one is "following"), and have

others follow his or her tweets (one's "followers"). All tweets are publicly accessible.[4]

In addition to a tweet's content, the time and date of each tweet also appears publicly; the

location from where the tweet was made is not publicly available. In addition to public

tweets, Twitter users may also use Twitter to communicate privately with other Twitter

users via direct messages ("DMs"). All information regarding those DMs, including their

content, their sender and recipient, and their time and date, is private and not publicly

available.

As with other forms of Internet communications, what individuals say on Twitter,

and when and where they use Twitter, can potentially reveal information about their

thoughts, beliefs, associations, and actions. Twitter thus enables any individual to

"become a town crier with a voice that resonates farther than it could from any soapbox,"

---

http://www.pewinternet.org/~/media//Files/Reports/2009/PIP_Twitter_Fall_2009web.pdf
(19% of Internet users use Twitter or a similar service as of October 2009, up from 11%
in April 2009 and 6% in August 2008).
[3] Ethan Zuckerman, *The First Twitter Revolution?*, Foreign Policy, January 14, 2011,
*available at* http://www.foreignpolicy.com/articles/
2011/01/14/the_first_twitter_revolution?page=full; *see also* Brad Stone & Noam Cohen,
*Social Networks Spread Defiance Online*, N.Y. Times, June 16, 2009, at A11, *available
at* http://www.nytimes.com/2009/06/16/world/middleeast/16media.html (discussing use
of Twitter by Iranian dissidents).
[4] Twitter has a "protect" feature that allows a subscriber to make tweets available only to
chosen individuals, but that feature is not at issue here.

*Reno v. American Civil Liberties Union,* 521 U.S. 844, 870 (1997), and continues the role of the Internet as "the most participatory form of mass speech yet developed." *Id.* at 863.

## III.   THE DECEMBER 14, 2010 ORDER TO TWITTER.

In response to an Application by the United States, the Court issued an Order on December 14, 2010 that requires Twitter to disclose information concerning the accounts of several of its subscribers, including Movants (the "Twitter Order"). *See* Twitter Order, attached as Ex. A to the Declaration of Aden J. Fine ("Fine Decl."), filed herewith. The Twitter Order demands, among other things, information concerning four Twitter accounts: @wikileaks, @ioerror, @birgittaj, and @rop_g. Movants are the holders of the last three accounts. Among other things, the Order requires Twitter to disclose Movants' (1) personal contact information ("mailing addresses, residential addresses, business addresses, e-mail addresses, and other contact information"), (2) financial data ("means and source of payment for such service (including any credit card or bank account number) and billing records"), (3) account activity information ("records of user activity for any connections made to or from the Account, including the date, time, length, and method of connections, data transfer volume, user name, and source and destination Internet Protocol address(es)"),[5] and (4) DM information ("non-content information associated with the contents of any communication or file stored by or for the account(s), such as the source and destination email addresses and IP addresses"). *See* Twitter Order, Attachment A. The Order covers all activity on the accounts, apparently

---

[5] An Internet Protocol ("IP") address is a unique numerical address that identifies individual computers or other devices as they interact over the Internet. IP addresses can be used to determine where a computer is located when it is connected to the Internet.

6

including DMs, regardless of subject matter, for the time period from November 1, 2009 to the present.

As a result of negotiations between Twitter and the government, to reduce the burden on Twitter and to recognize that Twitter does not have certain of the requested information, Movants understand that the government is presently restricting the time period of its request to November 15, 2009-June 1, 2010, and that the scope of the information sought has been limited to contact information for the four account holders, the IP addresses used each time Movants logged into their accounts, and information regarding DMs between the four Twitter accounts named in the Order.[6]

The Twitter Order was issued pursuant to 18 U.S.C. § 2703(d), which is part of the Stored Communications Act ("SCA"). *See* Twitter Order. The SCA governs access to the contents of "wire or electronic communications" that are in "electronic storage in an electronic communications system" or that are "in a remote computing service." 18 U.S.C. § 2703(a)-(b). It also governs access to "record[s] or other information pertaining to a subscriber to or customer of" an "electronic communication service or remote computing service." *Id.* § 2703(c). Content that has been stored in an electronic communications system for more than 180 days, content stored in a remote computing service, or any "records or other information," may be obtained with a warrant, administrative subpoena, or § 2703(d) court order. *Id.* § 2703(a)-(b), (d). To obtain a § 2703(d) order, the government must offer "specific and articulable facts showing that

---

[6] The government has not conceded that its original Order was improper in any manner. Nor has the government agreed never to ask for the full scope of the originally demanded information. As a result, Movants' challenge to the Twitter Order need not be limited to the narrowed demand.

there are reasonable grounds to believe" that the information or records sought are both "relevant and material to an ongoing criminal investigation." *Id.* § 2703(d).

The SCA does not contain a provision permitting the sealing of orders issued pursuant to its terms. Prior notice to the affected subscriber, however, is not statutorily required if the government uses a warrant or only seeks disclosure of "a record or other information pertaining to a subscriber to or customer of [an electronic communication or remote computing] service." *Id.* § 2703(c).[7] Where the government is not required to provide notice or is entitled to delay notice, the government may also obtain a court order commanding the communications provider not to notify anyone of the existence of the warrant, subpoena, or court order "for such period as the court deems appropriate," provided that the court determines that notification "will result in" a specifically defined adverse result. *Id.* § 2705(b).

Despite the lack of statutory authority, the Twitter Order and all related documents were apparently filed under seal. Additionally, the Order prohibited Twitter from disclosing it to anyone, presumably pursuant to a finding under § 2705(b). Twitter's policy is "to notify users of requests for their information prior to disclosure unless we are prohibited from doing so by statute or court order." Twitter, Twitter Help Center – Guidelines for Law Enforcement, http://support.twitter.com/entries/41949-guidelines-for-law-enforcement (last visited Jan. 25, 2011). Although there is not presently a public record about what happened after Twitter received notice of the

---

[7] Prior notice must be provided when a court order or administrative subpoena is used to obtain the "contents of any wire or electronic communication." *Id.* § 2703(b). In such circumstances, the government may seek an order delaying such notification for a period of up to ninety days when notification "may have" a specifically defined "adverse result." *Id.* § 2705(a)(1)-(2).

Twitter Order, the Court entered an Order on January 5, 2011 unsealing the Twitter Order

(the "Unsealing Order").[8] *See* Unsealing Order, attached as Ex. B to Fine Decl.

According to the Unsealing Order, "it is in the best interest of the investigation to unseal

the Court's Order of December 14, 2010 and authorize Twitter to disclose that Order to

its subscribers and customers." *See* Unsealing Order.

On January 7, 2011, following issuance of the Unsealing Order, Twitter sent the

Twitter Order to Movants, along with emails informing Movants that Twitter would be

forced to comply with the Order unless Movants took appropriate legal actions. *See, e.g.,*

Ex. C to Fine Decl. The disclosure of the Twitter Order was front-page news around the

world.[9] Widespread interest has focused on whether similar orders have been issued to

other companies concerning Movants and the other targeted individuals.[10] Several other

companies believed to have received similar orders have refused to comment on the

matter, increasing the belief that such orders exist.[11]

Movants now bring this motion to unseal this docket and any other § 2703 orders

to other companies regarding Movants to permit Movants to obtain the information

---

[8] The Unsealing Order does not indicate whether the Court issued the Unsealing Order *sua sponte* or in response to a motion or oral request. It also does not reveal the original justification for sealing the Twitter Order.

[9] *See, e.g.,* Scott Shane & John F. Burns, *U.S. Subpoenas Twitter Over WikiLeaks Supporters,* N.Y. Times, Jan. 9, 2011, at A1, *available at* http://www.nytimes.com/2011/01/09/world/09wiki.html; David Batty, *US. Orders Twitter To Hand Over WikiLeaks Members' Private Details,* The Guardian, Jan. 8, 2011.

[10] *See, e.g.,* Barton Gellman, *Twitter, Wikileaks and the Broken Market for Consumer Privacy,* Time Magazine: Techland, Jan. 14, 2011, http://techland.time.com/2011/01/14/twitter-wikileaks-and-the-broken-market-for-consumer-privacy/.

[11] *See, e.g.,* Gellman, *Twitter, Wikileaks and the Broken Market for Consumer Privacy, supra;* Miguel Helft & Claire Cain Miller, *1986 Privacy Law Is Outrun by the Web,* N.Y. Times, Jan. 10, 2011, at A1, *available at* http://www.nytimes.com/2011/01/10/technology/10privacy.html.

9

necessary to protect their constitutional rights, and to enlighten the public about the

government's investigation of WikiLeaks and the government's use of its electronic

surveillance authorities to monitor individuals' Internet communications.

ARGUMENT

**I. THE UNSEALING OF THE TWITTER ORDER REMOVES THE
JUSTIFICATION FOR CONTINUED SEALING OF THE SEALED
DOCUMENTS.**

Courts have recognized that the government may frequently have a legitimate

interest in maintaining the secrecy of an ongoing criminal investigation and in avoiding

tipping off potential witnesses that they are being investigated. That rationale for sealing

is absent here. First, the unsealing of the Twitter Order, which appears to have been done

with the government's approval, confirms the existence of the underlying criminal

investigation. Second, the unsealing of the Twitter Order makes clear that the

government is seeking information about Movants. As a result, there is no risk that

unsealing other § 2703 orders to Movants' other service providers would seriously

jeopardize the investigation or tip off witnesses. Now that the Court has unsealed the

Order to Twitter, there can be no legitimate justification, let alone a compelling interest,

for keeping all of these documents under seal. *See, e.g., United States v. Klepfer (In re
The Herald Co.)*, 734 F.2d 93, 101 (2d Cir. 1984) (closure impermissible where the

information "sought to be kept confidential has already been given sufficient public

exposure"); *United States v. James*, 663 F. Supp. 2d 1018, 1020-21 (W.D. Wash. 2009)

(unsealing documents in criminal case with only narrow redactions because the

information was already publicly available).

At a minimum, given the Court's ruling that disclosing the Twitter Order is "in the best interest of the investigation," the government should be required to come forward with compelling evidence that continued sealing of any other § 2703 orders, as well as the other Twitter-related documents, is justified. Even if the government can assert some interest in maintaining secrecy of the sealed documents, that interest must be balanced against the interests of the Parties, *see* below, and the public, *infra* at 14-28.

## II. MOVANTS NEED THESE DOCUMENTS UNSEALED SO THAT THEY CAN PROTECT THEIR FUNDAMENTAL RIGHTS.

Movants have a strong interest in learning whether their private communications are being monitored so that they can mount constitutional and statutory challenges to the government's efforts. Movants have concurrently filed a motion to vacate the Twitter Order, and they intend to protect their fundamental rights by challenging any other § 2703 orders directed at their communications. They will, however, be unable to do so if the other government requests for information about their past speech activities remain hidden. They will also be hindered in challenging the Twitter Order if they are prevented from learning the legal arguments and non-confidential facts that the government has articulated as a basis for seeking this information.

Movant's constitutional rights are implicated by the government's demand for information. Like many members of the public, Movants routinely use the Internet for self-expression, publication, association, and communication. They, like many people, have multiple electronic communications accounts, with various technology companies, that offer opportunities to communicate with others, both individually and en masse. Records concerning their lawful communications will reveal highly personal, intimate matters about Movants' lives and their expressive activities and associations. For

11

example, the Twitter Order requires Twitter to provide the government with information regarding the identity of anyone with whom Movants have sent or received private DMs, including those individuals' email addresses and their IP addresses. The Order also compels the disclosure of information about every time Movants have logged on to their Twitter accounts during a lengthy time period, including the date, time, and duration of each visit, regardless of whether such log-ins had any relationship to WikiLeaks. The Order would also require identification of every IP address used by Movants while they were accessing and using their Twitter accounts, which could be used to determine Movants' geographical location at all such times, again without regard for the subject matter or nature of their activities at the time.[12]

This detailed information about Movants' communications is private; combining that information with Movants' records from their other private communications accounts will provide an even deeper and more invasive glimpse into their daily thoughts, associations, and activities, implicating Movants' constitutional rights. Based on the existence of the Twitter Order, Movants reasonably believe that the government has sought information about their communications from other providers of electronic communication services or remote computing services, and that these § 2703 orders and related documents remain under seal.[13]

---

[12] That Twitter does not have some of this information or that it was able to convince the government that production here would be burdensome is of no matter. The government has not withdrawn its original demand, and other services receiving § 2703 orders may have such data and may not have argued that production was burdensome.

[13] Movants' belief is shared by neutral observers of the situation. *See, e.g.,* Gellman, *Twitter, Wikileaks, and the Broken Market for Consumer Privacy, supra* ("It is beyond reasonable doubt that authorities asked other companies to supply the same kinds of information sought from Twitter, but none of them admit it."); Glenn Greenwald, *DOJ Subpoenas Twitter Records of Several WikiLeaks Volunteers,* Salon.com, Jan. 7, 2011,

These documents should therefore be unsealed to provide Movants with the ability to challenge the government's attempt to obtain this private information about their communications. Where, as here, a subpoena or *ex parte* court order to a third party implicates an individual's First Amendment rights, that individual (the "target" of the request) has the right to challenge the government request. In *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975), for instance, the Supreme Court held that individuals whose First Amendment records are subpoenaed from a third party can bring an immediate action challenging the subpoena because otherwise their constitutional rights might permanently be frustrated. *Id.* at 501 & n.14; *see also id.* at 514 (Marshall, J., concurring) (emphasizing that the target must be given a forum to "assert its constitutional objections to the subpoena, since a neutral third party could not be expected to resist the subpoena by placing itself in contempt"); *Pollard v. Roberts*, 283 F. Supp. 248, 258-59 (E.D. Ark. 1968) (three-judge court), *aff'd per curiam*, 393 U.S. 14 (1968) (considering targets' challenge to subpoenas directed at third-party bank and enjoining subpoenas on grounds that enforcement would violate targets' First Amendment rights of association);[14] *Grandbouche v. United States (In re First Nat'l Bank)*, 701 F.2d 115, 117-19 (10th Cir. 1983) (holding that targets had standing to challenge third-party records subpoena and remanding for evidentiary hearing on targets' claims that government's compulsion of information from bank would violate targets' First Amendment right of association); *Local 1814, Int'l Longshoremen's Ass'n, AFL-*

---

http://www.salon.com/news/opinion/glenn_greenwald/2011/01/07/twitter ("It's difficult to imagine why the DOJ would want information only from Twitter . . . .").

[14] A summary affirmance by the Supreme Court operates as a judgment on the merits and "prevent[s] lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." *See, e.g., Mandel v. Bradley*, 432 U.S. 173, 176 (1977).

*CIO v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 271, 274 (2d Cir. 1981)

(permitting targets' challenge to third-party subpoena and upholding district court's

decision to narrow subpoena to limit impairment of targets' First Amendment rights of

association). Because continued sealing of the § 2703 orders and applications would

frustrate Movants' ability to exercise their right to mount First Amendment challenges to

the § 2703 orders, the sealed documents should be unsealed.

## III.   BOTH THE COMMON LAW AND THE FIRST AMENDMENT SUPPORT A RIGHT OF ACCESS TO THE SEALED DOCUMENTS.

In addition to Movants' personal interest in having the sealed documents

disclosed to them, there is also a strong public interest, shared by Movants, in having the

documents unsealed. That the judicial process should be as open to the public as possible

is a principle enshrined in both the common law and the Constitution. *See Richmond*

*Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Nixon v. Warner Commc'ns, Inc.*, 435

U.S. 589 (1978). Although § 2703 orders may implicate novel technologies and legal

processes, the law of access to judicial records is well established. Even if the

government possessed some conceivable argument for continued closure, it cannot

demonstrate that its interest is sufficient to overcome either the common law or First

Amendment right of access to the sealed documents.[15]

---

[15] Movants have standing to assert the public's right of access to the sealed documents. *See Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 167-68 (3d Cir. 1993) (holding that "'the applicability and importance of the interests favoring public access are not lessened because they are asserted by a private party to advance its own interests in pursuing its lawsuits against a party to the original action,'" and noting that, "[t]he Supreme Court has made it plain that all persons seeking to inspect and copy judicial records stand on an equal footing, regardless of their motive for inspecting such records" (alterations and citation omitted)).

### A. The Common Law Right Of Access Attaches To § 2703 Orders And Applications.

Courts have long recognized the public's right of access to court documents. *See, e.g., Nixon*, 435 U.S. at 597 ("[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."). The law's recognition of the importance of judicial transparency serves "the citizen's desire to keep a watchful eye on the workings of public agencies . . . [and] the operation of government." *Id.* at 598. As the Fourth Circuit has explained: "The value of openness in judicial proceedings can hardly be overestimated. 'The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat, which requires compelling justification.'" *United States v. Moussaoui*, 65 F. App'x 881, 885 (4th Cir. 2003) (quoting *Union Oil Co. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000)).

The Fourth Circuit has specifically noted that the public's interest in access "may be magnified" "[i]n the context of the criminal justice system":

> Society has an understandable interest not only in the administration of criminal trials, but also in law enforcement systems and how well they work. The public has legitimate concerns about methods and techniques of police investigation: for example, whether they are outmoded or effective, and whether they are unnecessarily brutal or instead cognizant of suspects' rights.

*Wash. Post Co. v. Hughes (In re Application & Affidavit for a Search Warrant)*, 923 F.2d 324, 330-31 (4th Cir. 1991). Put simply, the right of access is "fundamental to a democratic state." *United States v. Mitchell*, 551 F.2d 1252, 1258 (D.C. Cir. 1976), *rev'd on other grounds sub nom. Nixon v. Warner Commc'ns*, 435 U.S. 589 (1978).

15

Section 2703 orders indisputably qualify as judicial records subject to the right of access. Because the judiciary's very legitimacy stems from its issuance of reasoned decisions, documents authored or generated by a court, such as court orders, are core judicial records. *See, e.g., United States v. Mentzos*, 462 F.3d 830, 843 n.4 (8th Cir. 2006), *cert. denied*, 549 U.S. 1359 (2007) (denying motion to file opinion under seal "because the decisions of the court are a matter of public record"); *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1335 n.1 (Fed. Cir. 2002) (rejecting request to file decision under seal); *In re Sealing and Non-Disclosure of Pen/Trap/2703(d) Orders*, 562 F. Supp. 2d 876, 891 (S.D. Tex. 2008) (rejecting permanent sealing of § 2703(d) orders because "documents authored or generated by the court itself" are in the "top drawer of judicial records," a drawer that is "hardly ever closed to the public"); *United States v. Rosen*, 487 F. Supp. 2d 703, 715-16 (E.D. Va. 2007) ("requiring a judge's rulings to be made in public deters partiality and bias. . . . In short, justice must not only be done, it must be seen to be done"). As the written record of the exercise of judicial power under the SCA, § 2703 orders constitute judicial records, subject to the right of access.

The right of access to judicial records applies not only to documents generated by a court, but also to materials filed by litigants upon which the court relies in performing its adjudicatory functions. *See, e.g., Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 63-64 (4th Cir. 1989) (holding that search warrant affidavits are judicial records to which a common law right of access attaches); *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180-81 (4th Cir. 1988) (including documents filed by litigants in the court record as among the "judicial records and documents" to which the common law presumption of access

16

attaches); *In re Search Warrant for Secretarial Area Outside the Office of Thomas Gunn*, 855 F.2d 569, 573 (8th Cir. 1988) (holding that search warrant applications and receipts qualify as "judicial records" subject to the right of access).

Section 2703 applications and related documents fall well within this criterion. A government entity seeking authorization to conduct electronic surveillance under the SCA must file an application with a court. The court must then carefully review the application to determine whether the statutory criteria have been satisfied before issuing an order. *See* 18 U.S.C. § 2703(d). As documents filed with, reviewed, and relied upon by courts in adjudicating whether to grant a § 2703 order, applications for such orders are judicial records subject to the public's right of access.

This common law right of access has not been superseded by statute. The Stored Communications Act does not contain a provision authorizing the sealing of § 2703 orders or related documents. The absence of a sealing provision in the SCA is not a mere accident or oversight. The Pen/Trap Statute, which parallels the SCA in several ways and was enacted alongside the SCA as Title III of ECPA (the SCA is Title II), specifically requires that an order issued under its provisions "be sealed until otherwise ordered by the court." 18 U.S.C. § 3123(d)(1). Similarly, the Wiretap Act, a surveillance statute that predates ECPA, also expressly provides that "Applications made and orders granted under this chapter shall be sealed by the judge." 18 U.S.C. § 2518(8)(b). The absence of a similar provision in the SCA makes clear that there is no statutory basis for sealing an application or order under the SCA that would overcome the common law right here. *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally

17

presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).[16]

## B. The First Amendment Right Of Access Attaches To § 2703 Orders And Applications.

Although the principles animating the First Amendment and common law rights of access are similar, courts have articulated a distinct First Amendment right of access to judicial records. "The first amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed." *Wash. Post v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991). "The first amendment right of access is, in part, founded on the societal interests in public awareness of, and its understanding and confidence in, the judicial system." *United States v. Chagra*, 701 F.2d 354, 363 (5th Cir. 1983) (internal citation omitted). This First Amendment right encompasses not only the right to attend trial and pretrial proceedings, but also the right to inspect documents filed in the course of civil and criminal proceedings. *See Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988) (holding that there is a First Amendment right of access to documents submitted in civil proceedings); *United States v. Soussoudis (In re Wash. Post Co.)*, 807 F.2d 383, 390 (4th Cir. 1986) (holding that there is a First Amendment right of access to documents filed in criminal proceedings).

This First Amendment right applies to the sealed documents in this case. Although an established history of closure may limit the availability of the First

---

[16] 18 U.S.C. § 2705(b), which authorizes courts to prohibit a recipient of a § 2703 order from notifying anyone of its existence when there is reason to believe disclosure "will result in" "seriously jeopardizing an investigation," does not provide a basis for sealing. Moreover, that justification is not present here.

Amendment right, *see Press-Enterprise Co. v. Super. Ct. of Cal.*, 478 U.S. 1, 8-9 (1986)

(*Press-Enterprise II*) (establishing an "experience" and "logic" analysis for determining

if a First Amendment right of access exists), a lack of historical openness does not mean

that there is no First Amendment right to the sealed documents where the type of

document or process at issue is new. Any such rule would artificially limit the right of

access to documents and processes that existed in an earlier era. *See, e.g., United States*

*v. Gonzales*, 150 F.3d 1246, 1258 (10th Cir. 1998) (concluding that there is "no history,

experience, or tradition of access" to documents "regarding requests for CJA assistance,"

but turning to the "logic prong because the procedure here is relatively new"); *United*

*States v. Simone*, 14 F.3d 833, 838 (3d Cir. 1994) (focusing on the logic prong after

concluding that the experience prong is not relevant where there is no history of either

openness or closure); *Seattle Times Co. v. U.S. Dist. Ct.*, 845 F.2d 1513, 1516 (9th Cir.

1988) (concluding that a mixed history of public access to pretrial detention proceedings

should not foreclose a right of access because such proceedings "have grown increasingly

important in the modern era" (internal citation omitted)); *Chagra*, 701 F.2d at 363

("Because the first amendment must be interpreted in the context of current values and

conditions, the lack of an historic tradition of open bail reduction hearings does not bar

our recognizing a right of access to such hearings." (internal citation omitted)).

The Fourth Circuit has held that there is no First Amendment right to search

warrant affidavits because of the long history of sealing such proceedings. *Baltimore*

*Sun*, 886 F.2d at 64-65.[17] That holding does not, however, mean that there is no First

---

[17] Although it finds that there is no First Amendment right to search warrant affidavits, *Baltimore Sun* makes clear that there is a common law right of access to the affidavits. 886 F.2d at 65.

19

Amendment right to the § 2703 orders and other documents at issue here, with the exception of any § 2703 search warrant affidavits. Unlike with search warrant affidavits, the "common sense reason" on which the Supreme Court (and the Fourth Circuit) relied for keeping search warrant proceedings closed—to avoid tipping off the target of the search until after the warrant was executed "lest he destroy or remove the evidence"—is not applicable here because the existence of the investigation is already public. *See id.* at 64 (quoting *Franks v. Delaware*, 438 U.S. 154, 169 (1978)). In addition, unlike search warrant proceedings, there is not a centuries-long, established tradition of closure with regard to the relatively new process of § 2703 proceedings. Indeed, in some circumstances, § 2703 orders are not secret at all; search warrant proceedings, by contrast, are consistently conducted in secret. Moreover, unlike with search warrants, because § 2703 orders are issued only to third parties for records under the third party's control, there is little fear that tipping off the search's target will lead to the destruction or removal of evidence.

Where, as here, there is not a meaningful history upon which to draw, courts have focused on the Supreme Court's "logic" prong to determine if there is a First Amendment right of access. *Press-Enterprise II*, 478 U.S. at 11 n.3 (1986) (noting that the First Amendment right attached to certain pretrial proceedings even when they had "no historical counterpart," where the "importance of the . . . proceeding" was clear). The focus of the logic prong is whether public access to § 2703(d) orders and applications plays a "significant positive role in the functioning of the particular process in question"—here, the judicial determination of whether to grant a § 2703 application. *See Press-Enterprise II*, 478 U.S. at 8-9. This assessment as to whether there should be such

20

access is made "in the context of current values and conditions." *Chagra*, 701 F.2d at 363.

As explained in more detail below, unsealing the § 2703 orders and applications in this case would have a significant positive role in promoting public understanding and discourse regarding the government's legal actions toward WikiLeaks and the nature and scope of the government's use of its electronic surveillance authorities to obtain sensitive personal information. That § 2703 applications are submitted and orders are granted outside the normal adversarial process only heightens the need for the public to have access to these documents to evaluate the work of prosecutors and judges. *See Press-Enterprise II*, 478 U.S. at 12-13 ("[T]he absence of a jury, long recognized as an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge, makes the importance of public access . . . even more significant." (internal quotation marks and citation omitted)); *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987) ("The appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch."). In short, for many of the same reasons that there is a common law right of access to § 2703 orders and applications, there is a First Amendment right of access as well.

**C.    The Government Cannot Meet Its Burden To Overcome The Presumption Of Access To The Sealed Documents.**

The common law right of access establishes a presumption in favor of access to judicial records and documents. *See Nixon*, 435 U.S. at 602. Once the presumption attaches, a court cannot seal documents or records indefinitely without considering

21

countervailing factors. The government bears the burden of "'showing some significant interest that outweighs the presumption'" of access, and, to rebut the presumption, must demonstrate that "'countervailing interests heavily outweigh the public interests in access.'" *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004) (quoting *Rushford*, 846 F.2d at 253).

Similarly, where, as here, judicial records implicate the First Amendment right of access, an even higher presumption of openness attaches. "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co. v. Super. Ct. of Cal.*, 464 U.S. 501, 510 (1984) (*Press-Enterprise I*); *see also Va. Dep't of State Police*, 386 F.3d at 575 ("a district court may restrict access only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest" (internal quotation marks and citation omitted)).

"Regardless of whether the right of access arises from the First Amendment or the common law, it 'may be abrogated only in unusual circumstances.'" *Va. Dep't of State Police*, 386 F.3d at 576 (quoting *Stone*, 855 F.2d at 182). Given that the Twitter Order has been unsealed, the government cannot meet its burden of establishing an interest in continued secrecy sufficient to "heavily outweigh" Movants' and the public's significant interest in access to these related records, let alone an "overriding," "compelling" interest necessary to withstand First Amendment scrutiny.

In addition to Movants' interest in obtaining access so that they can challenge the Twitter Order and any other § 2703 orders, *see supra* at 11-14, there is a significant public interest in unsealing these documents. The government's investigation of

22

WikiLeaks has sparked an intense debate within this country and abroad about

government secrecy, the government's efforts to protect classified information, the

relationship between that activity and the First Amendment, and whether the United

States can continue to honor our traditional freedoms and protect our safety at the same

time.[18] Because of its importance, Congress has held a hearing on the topic, bills have

been introduced to address the situation, and the Executive Branch is reconsidering its

information security procedures.[19] Even President Obama has contributed his views on

the subject.[20]

Unsealing the sealed documents would contribute greatly to the public's,

including Movants', ability to participate meaningfully in this ongoing debate.

Documents related to the legal actions that the government has already undertaken—and

the courts' reactions to such actions—will provide an as yet unseen perspective on this

matter. The public has a right to know about legal steps that the government is taking to

---

[18] *See, e.g.*, John Nichols, *Journalists Begin, Finally, To Stand Up in Defense of WikiLeaks and Freedom of Information*, The Nation: The Beat Blog, Dec. 14, 2010, http://www.thenation.com/blog/157106/journalists-begin-finally-stand-defense-wikileaks-and-freedom-information; Jack Goldsmith, *Seven Thoughts on Wikileaks*, Lawfare Blog, Dec. 10, 2010, http://www.lawfareblog.com/2010/12/seven-thoughts-on-wikileaks/; Marc A. Thiessen, *Obama Administration Is Weak in the Face of WikiLeaks*, Wash. Post, Nov. 29, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/11/29/AR2010112902474.html.
[19] *See The Espionage Act and the Legal and Constitutional Issues Raised by WikiLeaks: Hearing Before the H. Comm. On the Judiciary*, 111th Cong. (Dec. 16, 2010); Securing Human Intelligence and Enforcing Lawful Dissemination Act, H.R. 6506, 111th Cong. (2010); Securing Human Intelligence and Enforcing Lawful Dissemination Act, S. 4004, 111th Cong. (2010); OMB Watch, *In WikiLeaks' Wake, Administration Tightens Information Security*, Jan. 11, 2011, http://www.ombwatch.org/node/11452.
[20] *See, e.g.*, *Obama Calls WikiLeaks' "Deplorable,"* Reuters, Dec. 11, 2010, *available at* http://www.reuters.com/article/idUSTRE6BA24B20101211; President Barack Obama, Remarks After Bipartisan Leadership Meeting (July 27, 2010), *available at* http://www.whitehouse.gov/the-press-office/remarks-president-after-bipartisan-leadership-meetinga.

23

address this matter of intense national concern and how the courts are responding when, as here, there is not an overriding need for secrecy, and disclosure of the sealed documents would enable the public to evaluate the decisions of their elected officials and to reach their own determinations about the appropriateness of the government's actions.

In addition to the significant public interest in the subject matter of this particular investigation, the public also has a substantial interest in knowing more about the government's increasing electronic surveillance of lawful Internet activities. The Internet is the premier mode of long-distance communication today, and an increasing percentage of personal and business activities are conducted online each year.[21]   Recent developments in Internet technology, such as the creation of Twitter and Facebook, along with the advent of powerful portable computers, smart phones, cellular-based internet, and ubiquitous wi-fi connections, have resulted in an ever-increasing amount of personal data being stored online and, thereby, potentially available to law enforcement.[22]

Despite these dramatic technological developments, the law governing the government's ability to obtain information concerning electronic communications, the Electronic Communications Privacy Act of 1986 ("ECPA"), Pub. L. No. 99-508, 100 Stat. 1848 (1986), of which the SCA is Title II, has not been changed in the past twenty-five years. Congress is now considering doing so.[23]  To be able to consider intelligently

---

[21] *See* Pew Internet & American Life Project, Online Activities, 2000-2009, http://pewinternet.org/Static-Pages/Trend-Data/Online-Activities-20002009.aspx (last visited Jan. 21, 2011).

[22] *See generally* Paul Lanois, *Caught in the Clouds: The Web 2.0, Cloud Computing, and Privacy?*, 9 Nw. J. Tech. & Intell. Prop. 29 (2010).

[23] *See, e.g.*, The Electronic Communications Privacy Act: *Promoting Security and Protecting Privacy in the Digital Age: Hearing Before the S. Comm. on the Judiciary*, 111th Cong. (Sept. 22, 2010); *ECPA Reform and the Revolution in Cloud Computing:*

how to strike the balance between civil liberties and law enforcement in the digital age, the public and Congress need to know as much as possible about how the government is using its surveillance authorities to monitor individuals' Internet communications. Because the Twitter Order has been unsealed and Movants have now been provided notice and an opportunity to challenge the government's actions, this case presents the rare and valuable opportunity for the public to learn more about the nature and scope of the government's use of these electronic surveillance orders. Thus, even if this were not a case where the specific subject matter of these documents is of serious public concern, there would still be a significant public benefit in unsealing the documents. *See United States v. U.S. Dist. Ct. (Keith)*, 407 U.S. 297, 317 (1972) ("[T]hose charged with [the] investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks.").

Openness is especially critical here because the public has a "magnified" interest in judicial records relating to law enforcement processes and the criminal justice system. *In re Application & Affidavit for a Search Warrant*, 923 F.2d at 330-31 ("Society has an understandable interest not only in the administration of criminal trials, but also in law enforcement systems and how well they work."); *see also Press-Enterprise I*, 464 U.S. at 508 ("Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.").

As discussed earlier, given the unsealing of the Twitter Order, the government's investigation of WikiLeaks is not secret and cannot justify continued closure. As a result, the government may instead argue that there is a general need for secrecy concerning

---

*Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm. on the Judiciary,* 111th Cong. (Sept. 23, 2010).

25

ongoing criminal investigations and law enforcement methods which warrants keeping

the documents under seal. A general appeal to secrecy, however, cannot overcome the

right of access; instead, a specific, narrowly tailored need for sealing must be

demonstrated. *See Va. Dep't of State Police*, 386 F.3d at 579 (holding that because "not

every release of information contained in an ongoing criminal investigation file will

necessarily affect the integrity of the investigation," "it is not enough simply to assert" a

compelling government interest in the integrity of the investigation "without providing

specific underlying reasons for the district court to understand how the integrity of the

investigation reasonably could be affected by the release of such information");

*Baltimore Sun*, 886 F.2d at 65-66 (requiring that the sealing of search warrant affidavits

be justified by more than just the conclusion that "the public interest in the investigation

of crime" outweighs the media's interest in access).

Any legitimate government interests that exist can be accommodated through

redactions or continued sealing on a document-by-document basis. Because the right to

access is such a fundamental right, courts must first "consider less drastic alternatives to

sealing," and may not seal documents completely or hide the very existence of a docket if

it is possible to accommodate the government's interests by redacting specific

information. *Stone*, 855 F.2d at 181; *see also Baltimore Sun*, 886 F.2d at 66 (requiring

that the judicial officer consider alternatives to sealing documents, such as "disclosing

some of the documents or giving access to a redacted version"); *Moussaoui*, 65 F. App'x

at 889 ("[S]ealing an entire document is inappropriate when selective redaction will

adequately protect the interests involved"). In addition, before any motion to seal may be

granted, notice must be provided to the public and must ordinarily be docketed

26

"reasonably in advance of deciding the issue" to give the public an opportunity to object. *Stone*, 855 F.2d at 181.

Even in the case of search warrants, where the requirement to conduct proceedings "with dispatch to prevent destruction or removal of evidence" may necessitate moving quickly and before the public can have an opportunity to raise objections, the Fourth Circuit has still required advance public notice and "an opportunity . . . to voice objections to the denial of access," suggesting that such notice "can be given by docketing the order sealing the documents." *Baltimore Sun*, 886 F.2d at 65. Here, no public docket sheet or docket entries are even available for the public to see that something was filed under seal; indeed, even the now-unsealed Twitter Order is not in the case file. That is impermissible. *Stone*, 855 F.2d at 181; *see Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004) (striking down Connecticut's secret-docket system, holding that, "[T]he ability of the public and press to attend civil and criminal cases would be merely theoretical if the information provided by docket sheets were inaccessible" and that "docket sheets provide a kind of index to judicial proceedings and documents, and endow the public and press with the capacity to exercise their rights guaranteed by the First Amendment"); *United States v. Valenti*, 987 F.2d 708, 715 (11th Cir. 1993) (invalidating use of a parallel sealed criminal docketing procedure, and explaining that the "maintenance of a public and a sealed docket is inconsistent with affording the various interests of the public and the press meaningful access to criminal proceedings"); *In re Search Warrant*, 855 F.2d at 575 (holding that sealing of district court docket sheets was "improper" and requiring that entry of closure or sealing order be noted on the public docket "absent extraordinary circumstances").

27

Because the government does not have a compelling interest in keeping the sealed

documents under seal and because the government cannot demonstrate that any continued

interest it does possess heavily outweighs Movants' and the public's interest in access,

the documents should be unsealed and made publicly accessible.

## CONCLUSION

For the foregoing reasons, Movants request that all documents relating to the

Twitter Order and any similar § 2703 orders to entities other than Twitter be unsealed.


Dated: January 26, 2011                          Respectfully Submitted,


                                         By:  _____

                                         John K. Zwerling, VSB No. 8201
                                         Stuart Sears, VSB No. 71436
                                         ZWERLING, LEIBIG & MOSELEY, P.C.
                                         108 North Alfred Street
                                         Alexandria, VA  22314
                                         Telephone:       (703) 684-8000
                                         Facsimile:       (703) 684-9700
                                         Email:    JZ@Zwerling.com
                                         Email:    Chris@Zwerling.com
                                         Email:    Andrea@Zwerling.com
                                         Email:    Stuart@Zwerling.com

                                         John W. Keker (*pro hac vice* pending)
                                         Rachael E. Meny (*pro hac vice* pending)
                                         Steven P. Ragland (*pro hac vice* pending)
                                         KEKER & VAN NEST LLP
                                         710 Sansome Street
                                         San Francisco, CA  94111-1704
                                         Telephone:       (415) 391-5400
                                         Facsimile:       (415) 397-7188
                                         Email:    jkeker@kvn.com
                                         Email:    rmeny@kvn.com
                                         Email:    sragland@kvn.com

                                         **Attorneys for JACOB APPELBAUM**

28

Dated:  January 26, 2011

By: _____ with permission for :

Nina J. Ginsberg, VSB No. 19472
DIMUROGINSBERG, P.C.
908 King Street, Suite 200
Alexandria, VA 22314
Phone: 703-684-4333
Fax:    703-548-3181
Email:  nginsberg@dimuro.com

John D. Cline (*pro hac vice* pending)
LAW OFFICE OF JOHN D. CLINE
115 Sansome Street, Suite 1204
San Francisco, CA  94104
Phone:  415.322.8319
Fax:  415.524.8265
Email:  cline@johndclinelaw.com

K.C. Maxwell (*pro hac vice* pending)
LAW OFFICE OF K.C. MAXWELL
115 Sansome Street, Suite 1204
San Francisco, CA  94104
Phone:  415.322.8817
Fax:  415.888.2372
Email:  kcm@kcmaxlaw.com


**Attorneys for ROP GONGGRIJP**

29

Dated:  January 26, 2011

By: _____ with permission for:

Rebecca K. Glenberg, VSB No. 44099
AMERICAN CIVIL LIBERTIES UNION
  OF VIRGINIA FOUNDATION, INC.
530 E. Main Street, Suite 310
Richmond, Virginia 23219
Telephone: (804) 644-8080
Facsimile:  (804) 649-2733
Email:  rglenberg@acluva.org


Cindy A. Cohn (*pro hac vice* pending)
Lee Tien (*pro hac vice* pending)
Kevin S. Bankston (*pro hac vice* pending)
Marcia Hofmann (*pro hac vice* pending)
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone:  (415) 436-9333 x108
Facsimile:  (415) 436-9993
Email:  cindy@eff.org
Email:  tien@eff.org
Email:  bankston@eff.org
Email:  marcia@eff.org


Aden J. Fine (*pro hac vice* pending)
Benjamin Siracusa-Hillman (*pro hac vice*
pending)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone:  (212) 549-2500
Facsimile:  (212) 549-2651
Email:  afine@aclu.org
Email:  bsiracusahillman@aclu.org


**Attorneys for BIRGITTA JONSDOTTIR**

30

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was delivered by hand this 26th day of January, 2011, to the U.S. Attorney Box located in the Clerk's office, addressed to:

Tracy Doherty McCormick
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Ph: 703 299-3715
Email: Tracy.McCormick@usdoj.gov

Stuart Alexander Sears