# EXHIBIT A

INTER-PARLIAMENTARY UNION

CHEMIN DU POMMIER 5
1218 LE GRAND-SACONNEX / GENEVA (SWITZERLAND)

TELEPHONE + 41 22 - 919 41 50 - FAX + 41 22 - 919 41 60 - E-MAIL postbox@mail.ipu.org

# CONFIDENTIAL

## COMMITTEE ON THE HUMAN RIGHTS OF PARLIAMENTARIANS

### CASE No. IS/01 - BIRGITTA JÓNSDÓTTIR - ICELAND

*Confidential decision adopted by the Committee at its 132nd session*
*(Geneva, 17 - 20 January 2011)*

The Committee,

*Considering* the following information on file:

- Birgitta Jónsdóttir has been a member of the Icelandic Parliament since July 2009. She reportedly provided assistance to Wikileaks earlier that year in connection with the release of a video showing US soldiers shooting civilians in Bagdad from a helicopter;

- On 7 January 2011 she was informed by Twitter that it had received an Order from the United States District Court for the Eastern Division of Virginia to turn over to the United States the records and other information concerning her account contained in an Attachment. Twitter has been given a delay until 26 January to provide the information to the United States Government;

- The information sought by the US Government with respect to Birgitta Jónsdóttir concerned the period starting 1 November 2009 until present and involves subscriber account information including names, user names, screen names or other identities, mailing and other addresses, connection records, or records of session times and duration, length and types of service, telephone or instrument number or other subscriber number or identity, means and sources of payment for such services, including any credit card or bank account number, and billing records, records of user activity for any connections made to or from the account, including the date, time, length, and method of connections, data transfer volume, user name, and source and destination Internet protocol address(es), non-content information associated with the contents of any communication or file stored by or for the account, and correspondence and notes of records related to the accounts;

- Members of the Althingi are protected under Article 49 of the Icelandic Constitution, which states that "No member of Althingi may be subjected to custody on remand during a session of Althingi without the consent of Althingi, nor may a criminal action be brought against him unless he is caught in the act of committing a crime. No member of Althingi may be held accountable outside Althingi for statements made by him in Althingi, except with the consent of Althingi."

- The first court order, which was dated 14 December 2010, was originally kept secret and was only revealed to Birgitta Jónsdóttir after Twitter took steps to ensure that it could notify the individual concerned. Birgitta Jónsdóttir fears that efforts may be under way by US authorities to obtain information about her and her activities also through other US-based companies;

- Birgitta Jónsdóttir believes that the investigation carried out by the US authorities can restrict her ability to carry out her parliamentary work,

*Considering* moreover that:

- Members of parliament benefit from fundamental freedoms, including the right to privacy as well as of specific measures of protection to allow them to carry out their work unimpeded;

- Parliamentary immunity ensures that members of parliament cannot be held to account for the opinions they express and the votes they cast and countries have generally put special mechanisms in place to ensure that they can carry out their mandate without undue restrictions and with full respect for their freedom of expression;

- In all countries, freedom of expression is essential to enabling democracy to work; citizens cannot exercise their right to vote or take part in public decision-making if they do not have free access to information and ideas and are not able to express their views freely;

- Freedom of expression is even more essential to members of parliament and is recognized as such by courts all over the world; without the ability to express their opinions freely, members of parliament cannot represent the people who have elected them;

- Members of parliament are elected by people to represent them in parliament. In their daily work they legislate and they hold the governments to account. They are unable to perform these duties if they cannot receive and exchange information freely without fear of intimidation;

- Citizens will not communicate sometimes sensitive information to their representative without the assurance that their identity will be protected. Members of parliament, therefore, find themselves in the same situation as journalists, with an absolute need to be able to protect their sources.

*Also considering* the following information:

- Twitter is a website, owned and operated by Twitter Inc. It offers a social networking and microblogging service that enables its users to send and read messages called *Tweets*, which are text-based posts of up 140 characters displayed on the user's profile page. Tweets are publicly visible by default; however, senders can restrict message delivery to followers;

- Members of parliament are increasingly availing themselves of modern means of communication with citizens. A vast majority of parliamentarians today communicate by e-mail. Social media - Facebook, Twitter, etc. - are on the rise, in particular among young members of parliament and when MPs communicate with youth. These forms of communication are rapidly complementing and replacing yesterday's telex, telephone calls and faxes;

- The new social media offer vast opportunities for members of parliament to communicate with the public and to exchange information that is essential to them in their daily work. The use of these media, however, also presents significant risks to parliamentarians that their privacy will be invaded and their parliamentary work impaired;

- For members of parliament, it is essential that any private communication they receive is accorded the same level of protection regardless of the technology, platform and business model used to create, communicate and store it. This does not appear to be the case today.

1. *Recalls* that freedom of expression goes to the heart of democracy and is essential to members of parliament; without the ability to express their opinions freely, members of parliament cannot represent the people who have elected them; if they cannot receive and exchange information freely without fear of interference they cannot legislate and hold the government to account;

2. *Also recalls that* Article 19 of the Universal Declaration of Human Rights upholds the right of everyone to freedom of opinion and expression; it stipulates that this right includes freedom to hold opinions without interference and to seek, receive, and impart information and ideas through any media and regardless of frontiers;

3. *Notes* that under standard human rights conventions and their jurisprudence, restrictions on the freedom of expression are subjected to a threefold test: they should be prescribed by law, they must be necessary in a democratic society and they must be proportionate to these necessary purposes;

4. *Fails to see* how the restrictions on freedom of expression that would result from compliance with the court order can be justified on such grounds and *holds that,* to the contrary, such compliance would jeopardise a member of parliament's right to freedom of expression and hence her ability to seek, receive and impart information freely, which is absolutely necessary in a democratic society;

5. *Is concerned* that the national and international legal framework concerning the use of electronic media, including social media, does not appear to provide sufficient guarantees to ensure respect for freedom of expression and parliamentary immunity;

6. *Expresses deep concern,* therefore, over the efforts made to obtain information regarding the communications of a member of parliament and the consequences this is likely to have for all members of parliament on their ability to discharge their popular mandate freely;

7. *Requests* the Secretary General to communicate these concerns to the authorities in Iceland and in the United States and to seek their views; with regard to the United States, *also requests* the Secretary General to explore the possibility of submitting a legal brief to the relevant judicial authorities setting out the IPU's concerns;

8. *Also requests* the Secretary General to conduct an urgent study with a view to formulating guidelines for strengthening the system of parliamentary immunities so that members of parliament can continue to enjoy freedom of expression while using the new social media;

9. *Decides* to continue examining this case at its next session, to be held during the 124th IPU Assembly (April 2011).