# EXHIBIT B


# INTER-PARLIAMENTARY UNION

CHEMIN DU POMMIER 5
1218 LE GRAND-SACONNEX / GENEVA (SWITZERLAND)

TELEPHONE (41.22) 919 41 50 - FAX (41.22) 919 41 60 - E-MAIL postbox@mail.ipu.org

**MEMORANDUM SUBMITTED BY THE INTER-PARLIAMENTARY UNION IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C PARA. 2703 (D) AS FAR AS IT CONCERNS MP BIRGITTA JONSDOTTIR**

The Inter-Parliamentary Union (IPU) submits this document through its Secretary General, Mr. Anders B. Johnsson, who is authorized to sign of behalf of the Organisation and to submit this document to the Court.

The case of Mrs. Birgitta Jonsdottir was officially referred to the IPU and its Committee on the Human Rights of Parliamentarians, which has the mandate to examine cases of alleged violations of the fundamental rights of members of parliament. Through its Committee, the IPU has gathered comprehensive experience of parliamentary practice and law in parliaments across the world. Its views on the issues at stake in this case may therefore be of interest to the Court. (Details regarding the IPU and the Committee on the Human Rights of Parliamentarians are set out below).

**1. The Inter-Parliamentary Union (IPU) and its communication's procedure regarding human rights violations of members of parliament**

1.1. Established in 1889 by a French and British Member of Parliament to promote the idea of arbitration of conflicts, the IPU is today the international organization of national parliaments of sovereign States. The IPU currently has 155 member parliaments and 9 associate members, which are regional parliamentary assemblies. The IPU is the focal point for world-wide parliamentary dialogue, and works for peace and cooperation among peoples and for the firm establishment of representative democracy. The IPU supports the efforts of the United Nations, whose objectives it shares, including the promotion and protection of human rights. The IPU is financed primarily out of public funds. Its headquarters are located in Geneva. It has an office in New York.

1.2. In 1976, as part of its efforts to strengthen the institution of parliament, the IPU set up a special procedure for the examination of communications regarding human rights violations of members of parliament, which is implemented by the Committee on the Human Rights of Parliamentarians. The rationale for this procedure is that members of parliament must be able to exercise their human rights, in particular their freedom of speech, if they are to exercise their representative mandate and to promote and protect the human rights of others. The Committee, which is composed of five titular members representing the major geopolitical regions, is currently examining 74 cases of 403 members of parliament in 38 countries across the world.

## 2. The submission of the case of MP Birgitta Jonsdottir to the Committee on the Human Rights of Parliamentarians (CHRP)

In January 2011, the Parliament of Iceland (Althingi) and Mrs. Jonsdottir, member of the Althingi since July 2009, informed the IPU secretariat that, as part of an apparent criminal investigation concerning Wikileaks, the United States Department of Justice had sought and obtained an order from the United States District Court for the Eastern District of Virginia, requiring Twitter to turn over to the United States extensive records and information concerning Mrs Birgitta Jonsdottir's Twitter account covering the period from 1 November 2009 to 1 June 2010. The order was initially kept secret from her and was only revealed to her on 7 January 2011, after Twitter had obtained authorization to notify her of the Order. It appears that Mrs. Jonsdottir's was included in the Order as she had provided assistance to Wikileaks in connection with the release of a video showing US soldiers shooting civilians in Bagdad from a helicopter.

The CHRP was requested to take up this matter. At its 132nd session (17-20 January 2011), the CHRP examined the case and adopted a decision, a copy of which is attached. It requested the Secretary General of the IPU to inform the competent authorities of the United States of America of its concerns in this case.

## 3. Concerns

The major concerns that were raised by the Committee with respect to Mrs. Jonsdottir's situation relate to the following issues:

### 3.1. Freedom of expression

Freedom of expression, along with freedom of assembly and association, is a cornerstone of a democratic society, which cannot exist without the free flow of ideas and information. It is enshrined in Article 19 of the Universal Declaration of Human Rights and of the International Covenant on Civil and Political Rights (ICCPR). As set out in Article 19 of the ICCPR, freedom of expression includes "the freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice". Freedom of expression has therefore an individual and social dimension: it is a right that belongs to individuals, and also implies the collective right to receive any information whatsoever and to have access to the thoughts expressed by others. All regional and international human rights bodies have underlined the paramount importance of this right for democracy. Freedom of expression is today also enshrined in almost all Constitutions of the world. Iceland guarantees it under Article 73 of its Constitution.

It is not contested that freedom of expression is particularly important for members of parliament who, in accordance with their representative mandate must be able to speak out freely, to seek, receive and impart information of all kinds, through the means of their choice and regardless of frontiers. Without the free exercise of that right, members of parliament would be unable to fulfil their constitutional mandate of legislating and holding the government to account. In the case of Castells v. Spain (1992), the European Court of Human Rights captured this in the following way: "while freedom of expression is important for everybody, it is especially so for an elected representative of the people. He represents his electorate, draws attention to their preoccupations and defends their interests..." The Court found therefore that interferences with the freedom of expression of a member of parliament called for the closest scrutiny on its part.

Freedom of expression is not an absolute right and may be restricted. However, in accordance with international human rights law and relevant jurisprudence, restrictions on freedom of expression must meet a threefold test: they must be prescribed by law, they must be necessary in a democratic society and they must be proportionate to these necessary purposes.

Mrs. Jonsdottir, like an ever increasing number of members of parliament, uses Twitter and other social networking and microblogging services to communicate with her constituents and others, to seek and share information and ideas, to impart ideas and information and to receive ideas and information. It is an essential tool for her work as a member of parliament and the exercise of her legislative and oversight functions. During the period in question, she has exchanged thousands of (private) communications to this end.

It is doubtful that, under these circumstances, the disclosure of the extensive information sought by the US government would meet the threefold test which, in accordance with international law, is necessary for any restriction on freedom of expression, even more so of a member of parliament, to be admissible. On the contrary, such disclosure would have a chilling effect on Mrs. Jonsdottir's freedom of speech and greatly hamper the exercise of her parliamentary mandate. The threat of disclosure of private information would discourage her constituents and others to share information and to communicate. Members of parliament, like journalists, absolutely need to be able to protect their sources of information. Therefore, compliance with the Court Disclosure Order, rather than protect a purpose necessary in a democratic society, would jeopardise Mrs. Jonsdottir's ability to seek, receive and impart information freely, jeopardise the free exercise of her parliamentary mandate and hence, negatively impact on the representational function of parliament as such.

Moreover, the IPU Committee is concerned that orders to disclose information such as the one in question would set a dangerous precedent, and potentially affect members of parliament across the world who use Internet communication service providers. It is highly questionable that a government can use the mere presence of a company/service provider within its jurisdiction as an argument to seek speech related and private information about any member of parliament in the world, that happens to be stored by that service provider.

3.2. Parliamentary immunity

In all States over the world, parliamentarians enjoy a certain measure of protection precisely to enable them to exercise their freedom of expression without fear of intimidation from any quarter. There are different systems of parliamentary immunity. Members of the Icelandic Parliament are afforded immunity by virtue of Article 49 of the Constitution which stipulates as follows: "No member of Althingi (Parliament) may be subjected to custody on remand during a session of Althingi without the consent of Althingi, nor may a criminal action be brought against him/her unless he/she is caught in the act of committing a crime. ………."

Mrs. Jonsdottir is apparently part of a criminal investigation in a foreign country, the USA, because of the exercise of her freedom of expression via a social network that has its head office in the United States. She is thus deprived of the protection guaranteed to her under the Constitution of Iceland: the Parliament of Iceland has neither been asked to consent to the investigation targeting her, and even less so given its consent. The action of the US authorities has therefore the effect of rendering her protection under Icelandic law entirely non operational.

Since the use of social networks by members of parliament for communication with their constituents and others is today commonplace in many countries, disclosure orders as the one

in question would undermine and even render void the ability of States to protect their members of parliament from unwarranted interference with their mandate. This would be true also for member of the USA Congress, who could be held accountable for statements they expressed via an Internet service provider by the judicial authorities in another country in which that service provider has its head office.

The effect would be that the laws, even at the highest level, which States have adopted with a view to ensuring the free exercise of the parliamentary mandate would become void by the action of another State, and as a consequence not only impact on the ability of their parliaments to fulfil their constitutional functions but interfere with the sovereign right of States to determine their legal framework.

3.3. Right to privacy

Mrs. Jonsdottir has a right to privacy, which is guaranteed to her under Article 71 of the Constitution of Iceland and Article 17 of the ICCPR to which Iceland, like the United States of America, is a party. It comprises the right to protection of personal data and correspondence in any form, including by electronic means of communication. State interference is permissible only on the basis of a specific decision by a State authority expressly empowered by law to do so for the purpose of securing evidence or preventing crime and must respect the principle of proportionality[1].

Much of Mrs. Jonsdottir's communication exchanged via her Twitter account is of a private nature. The Court Order does not show a pressing need for State inspection of her private communication, and hence appears to interfere with her right to privacy.

3.4 Right to defend oneself

Mrs. Jonsdottir is concerned that the US authorities are seeking disclosure of information from other service providers without her knowledge. Should this be the case, her right to present her arguments and defence would be affected. It is a principle of natural justice that a person implicated in criminal proceedings, which seems to be her case, is entitled to be informed of the action against her so as to enable her to defend herself. The US authorities do not seem to have shown any pressing need, necessary in a democratic society, for shrouding their action against Mrs. Jonsdottir in secrecy.

For all the reasons set out above, the IPU Committee on the Human Rights of Parliamentarians believes that the Disclosure Order concerning Mrs. Jonsdottir's Twitter account should be vacated and that similar orders concerning other service providers be unsealed.

Geneva, 11 February 2011

Anders B. Johnsson
Secretary General

---

[1] Manfred Nowak, UN Covenant on Civil and Political Rights, CCPR Commentary, 2nd revised edition, 2005,