1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


------------------------------:
                              :
IN RE:  2703(d) ORDER;        :
        10GJ3793              :        Case No. 1:11-dm-3
                              :
------------------------------:




HEARING ON MOTIONS


February 15, 2011


Before:  Theresa C. Buchanan, Mag. Judge




<u>APPEARANCES:</u>

John S. Davis, Andrew S. Peterson and Tracy D. McCormick,
Counsel for the United States

John W. Keker and John K. Zwerling,
Counsel for Defendant Appelbaum

John D. Cline and Nina J. Ginsberg,
Counsel for Defendant Gonggrijp

Cindy A. Cohn, Aden J. Fine and Rebecca K. Glenberg,
Counsel for Defendant Jonsdottir

William B. Cummings, Counsel for Inter-Parliamentary Union

1          NOTE:  The case is called to be heard at 10:30 a.m.

2    as follows.

3          THE CLERK:  The United States of America versus

4    Jacob Appelbaum, et al., case number 11-dm-3.  Will counsel

5    please note their name for the record.

6          THE COURT:  Good morning.

7          MR. DAVIS:  Good morning, Your Honor.  John Davis

8    for the Government.  With me at counsel table is Andrew

9    Peterson and Tracy McCormick, we are all Assistant United

10   States Attorneys.

11         THE COURT:  All right.  Good morning.

12         MR. ZWERLING:  Good morning, Your Honor.

13         THE COURT:  Good morning.

14         MR. ZWERLING:  John Zwerling for Mr. Appelbaum.  I

15   would like to introduce John Keker, who has been admitted pro

16   hac vice.  I would like to introduce him to the Court, he is

17   from San Francisco.

18         THE COURT:  All right.  Good morning.  Nice to meet

19   you.

20         MR. KEKER:  Good morning, Your Honor.

21         THE COURT:  Good morning, Ms. Ginsberg.

22         MS. GINSBERG:  Good morning, Your Honor.  Nina

23   Ginsberg on behalf of Mr. Gonggrijp.  And I have with me John

24   Cline, who has been admitted pro hac vice.

25         THE COURT:  All right.

3

1          MS. GINSBERG:  He is also from San Francisco.

2          THE COURT:  Good morning.

3          MR. CLINE:  Good morning.

4          MS. GINSBERG:  Thank you.

5          THE COURT:  All right.  This comes on the

6    defendants' two motions.  And who is arguing these on behalf

7    of the defendants, Mr. Keker?  Excuse me, the petitioners

8    rather.

9          MS. GLENBERG:  Your Honor, I am sorry, we have more

10   attorneys to introduce.

11         THE COURT:  Oh, I'm sorry.

12         MS. GLENBERG:  I'm Rebecca Glenberg, local counsel

13   for Birgitta Jonsdottir.  And with me are Aden Fine and Cindy

14   Cohn, admitted pro hac vice.

15         THE COURT:  All right.  Good morning.  Is there

16   anyone else?

17         MR. CUMMINGS:  One more, Your Honor.

18         THE COURT:  I see.  How are you?

19         MR. CUMMINGS:  William Cummings on behalf of

20   Inter-Parliamentary Union, Your Honor.  We filed a motion for

21   amicus.

22         THE COURT:  Yes.  And I granted that.  Did you want

23   to argue today too?

24         MR. CUMMINGS:  We wanted the amicus to be approved,

25   that's all, Your Honor.

1          THE COURT:  I have done that.

2          MR. CUMMINGS:  Oh, good.  Thank you.

3          THE COURT:  Okay, thank you.  So, this is on the

4    petitioners' two motions.  Who is going to argue these?

5          MR. KEKER:  Your Honor, there are several motions.

6    I am John Keker representing Mr. Appelbaum.

7          THE COURT:  Good morning.

8          MR. KEKER:  I was going to argue the motion to

9    vacate.  Ms. Cohn is going to argue the motions to unseal

10   that, to the extent that they need to be argued, the ones that

11   are not substantive.

12          And Mr. Fine is arguing the substantive motion to

13   unseal, namely the application that led to the December 14

14   order.

15          THE COURT:  Okay.  I wasn't really planning to have

16   much argument on the motion to unseal the documents.  I just

17   needed the positions of both parties.  And I understand there

18   are a couple extra documents that I need the position of the

19   defendant-- the Government on.  But I don't think those are

20   really controversial.  That's just something I have to pick

21   through.

22          So, did you want to go ahead and argue the first

23   motion?

24          MR. KEKER:  Yes, ma'am, I would like to.  I would

25   like to.

1           And as I said, I represent, along with Mr. Zwerling

2    and Mr. Sears, Jacob Appelbaum, who is an American citizen.  I

3    am arguing the motion to vacate.  And I have been asked by the

4    other two movants to make an argument that really affects all

5    three of us.

6           THE COURT:  Okay.

7           MR. KEKER:  So, if they need to supplement it, they

8    will, but we're not going to, we're not going to triple-team

9    it.

10          THE COURT:  All right, thank you.

11          MR. KEKER:  And I'm sure you wouldn't let us.

12          THE COURT:  No, I wouldn't.  We are known as the

13   Rocket Docket, as you know.

14          MR. KEKER:  We guessed, we guessed, Your Honor.

15          The motion to vacate is directed to the December 14,

16   2010 order that the Government obtained ex parte.  There has

17   been some discussion in the briefs about a limitation that

18   Twitter and the Government have worked out, but as far as we

19   know and based on our discussions with the Government they

20   have not promised or otherwise officially limited that order.

21          So, my remarks are being directed to the order that

22   was issued by this Court on December 14, 2010 and which we saw

23   after it was unsealed in January of this year.

24          In that order, as the Court knows, the Government

25   demands information about all the connections via Twitter that

1  certain named individuals made, who sent, who received, where

2  they were.  I will talk more about that.  When they were sent,

3  the IP addresses.  Basically a map of the association of the

4  people who are bringing this motion.

5        And it is indeed ironic that we're making this

6  argument today given the events recently in Egypt and Tunisia,

7  this whole idea of the political use of social networking

8  mechanisms like Twitter has been, as I know the Court is

9  aware, very much in the news.  And it goes to the essence of

10  what we're concerned about here.

11        They applied for an order under 18 U.S.C. 2703(d),

12  the Stored Communication Act.  That requires, as we said very

13  strongly in our papers, that requires a very specific

14  statement of articulable facts showing that what they are

15  asking for is relevant and material to an ongoing criminal

16  investigation.

17        Needless to say, we haven't seen the application

18  that accompanied that order.  You have.  It makes it a little

19  awkward for me to be standing in front of you saying whatever

20  is in that application does not support the order that was

21  given, but I take solace in the fact that you recognized that

22  the order was presented to you ex parte.  We didn't have a

23  chance to make any of the arguments that were, that were

24  before you.  And I doubt very much that the Government brought

25  some of the arguments that we're bringing before you when the

1    order was presented.

2            So, let me jump in.  I mean, the first--

3            THE COURT:  And you can be assured I have read

4    everything.  So, you can just address what you think needs to

5    be highlighted or added to.

6            MR. KEKER:  Okay.  Well, there is enough back and

7    forth and intermeshing of arguments that I just wanted to make

8    sure that our position was very, very clear.

9            THE COURT:  Sure.

10           MR. KEKER:  The first and foremost reason to vacate

11   this order is statutory.  And that is, whatever the showing

12   they made, whatever is in those papers, they couldn't justify

13   an order as broad as the one that they obtained on

14   December 14.

15           Mr. Appelbaum, I will use as an example our client,

16   he is a major tweeter.  He at the time of these papers had

17   more than 9,000 tweets.  He had 10,000 followers.  He talked

18   about all kinds of political matters on them.  Some of them

19   having to do with Wikileaks, but a lot of them having nothing

20   to do with Wikileaks.

21           The order asked for the IP addresses that would

22   allow the Government to figure out who Mr., where Mr.

23   Appelbaum was at all times, was he at home, was on the road,

24   was he at his office, for a one-year period.  Later they

25   narrowed it to a six-and-a-half month period.  But still, it's

1    a huge amount of information that is not public.

2            There is no possible justification that they could

3    have put in that application to support getting all of his IP

4    addresses every time he published something of a political or

5    personal nature.  And there is no possible justification for

6    learning his location every time he sent a tweet no matter

7    what the application says.

8            So, the first--

9            THE COURT:  What do you mean no matter what the

10   application says?

11           MR. KEKER:  Well, it can't possibly--  I guess what

12   we're saying is, the application, I can just imagine--  I

13   mean, it has something to do with Wikileaks.  It has something

14   to do with these are people who know the Wikileaks founder.

15   The Government is interested in seeing what the connections

16   are between these people and the Wikileaks founder.  All of

17   that I can imagine.

18           What I can't imagine is how that leads to an order

19   as broad as the one they asked you for.  That's really our

20   point.

21           THE COURT:  Okay.

22           MR. KEKER:  I can't--  And I guess, let me back up

23   and say, if you grant, Mr. Fine will be arguing this, but

24   we've asked that the application be unsealed and we've asked

25   once it's unsealed for an opportunity to take a look at it

1   just as though it were a search warrant affidavit and raise

2   any issues that we see and get much more specific than we're

3   able to do now.

4         What I'm here to say though is because of the

5   breadth of the order, it can't, and whether or not there is a

6   core of the showing that they made that would justify some

7   order from this Court, it wouldn't justify an order as broad

8   as the one they asked for.

9         And that leads me to the second reason.  So, the

10  first reason is statutory.  And we're asking you to exercise

11  your discretion to vacate the order.

12        The second reason is constitutional.  And that is

13  the doctrine of constitutional avoidance.  If there is a

14  constitutional issue here that would have to be dealt with in

15  order to uphold this order, if it can be avoided by some

16  lesser means than getting to the constitutional issues under

17  the First and Fourth Amendment, it should be.

18        And that's what the Third Circuit opinion to some

19  extent was about that we've cited.  There the magistrate set

20  aside, and they sent it back to the magistrate for a further

21  factual showing, that set aside a 2703(d) order because the

22  magistrate thought that the Government should have gotten the

23  search warrant.

24        The Third Circuit said, well, we don't agree with

25  your reasoning, but there has got to be a lot more work here

1   done in a factual way to decide whether or not this order

2   would violate the Fourth Amendment.  And it's that that led

3   them to say the magistrate has discretion to say, no, I'm not

4   going to do this and to go ahead and require the Government to

5   get a warrant rather than have the hearing that would be

6   required under the Third Circuit opinion.

7           So, that's one thing that we're asking for, for you

8   to exercise your discretion that way.

9           Let met talk about the constitutional issues that

10  you would be avoiding if you did that.  And I want to start

11  with the Fourth Amendment.

12          The order allows the Government to follow Mr.

13  Appelbaum and others electronically for an extended period of

14  time and learn when he is at his home, when he is at his

15  office, when he's traveling, but primarily when he is in

16  protected places, places protected by the public amendment to

17  find out what he is doing.

18          And when the Government can know what you're doing

19  in your home or in your office, can get information that it

20  couldn't get by visual surveillance, that is a search under

21  the Fourth Amendment.  It's protected by the warrant

22  requirement, and probable cause is required to get a warrant.

23          The cases that we've cited, and I know you've read

24  and looked at in the briefs, include Karo, which dealt with a

25  beeper that ended up inside a house.  And maybe most

1    importantly <u>Kyllo</u>, which was decided 15 years later.  And

2    Justice Scalia made no uncertain--  I mean, Justice Scalia

3    said, when you find out what's happening inside somebody's

4    house, in that case it was somebody sitting outside trying to

5    figure out if heat lamps were on, when you find out--

6              THE COURT:  Well, aren't you overstating it just a

7    little bit in terms of what this, what this order goes to in

8    terms of what information the Government would be seeking as

9    to these petitioners?

10             As I can see it, they're not asking what these

11   people are doing in their homes or other private places.  They

12   are asking for location data primarily.  Isn't that correct?

13   I think you're exaggerating this quite a bit.

14             MR. KEKER:  I have been excused of exaggerating all

15   my life, Your Honor.  And I'm sorry, I won't, I will try not

16   to do it.

17             No, but I don't think I'm exaggerating.  They're

18   asking when tweets are being published, when certain political

19   speech is going out of the house, because that's public--

20             THE COURT:  Right.

21             MR. KEKER:  Where were--  Or not going out of the

22   house.  Where were you when that happened?  They're getting

23   location data that ties to messages.

24             THE COURT:  That doesn't exactly tell them what a

25   person is doing otherwise in their house, does it?

1          MR. KEKER:  Agreed.  No, it doesn't.

2          THE COURT:  Okay.

3          MR. KEKER:  It doesn't.  And both Karo and Kyllo

4    talk about that.  Does it need to be intimate detail of what's

5    going on in the house.  And the answer Justice Scalia tells us

6    is, no, it doesn't have to be intimate detail.

7          It can be information which coupled with inferences

8    allows you to gather information, gather evidence that is

9    useful to this ongoing criminal investigation.

10         The issue is, is it a search.  And the answer from

11   those cases is, yes, it is a search.  It doesn't have to be

12   particularly specific.  Because that was one of the major

13   arguments that the Government made that, oh, it's just, Karo

14   was limited to intimate details, and kind of more generic

15   information coming out of the house is not important.

16         THE COURT:  Well, how is this any different than the

17   scenario that you just stated where they would observe the

18   defendant, follow him, know where he is?  By following him,

19   you know, around town, seeing when he goes home, seeing when

20   he is at his office or other places, and then matching that

21   with his public tweets.

22         How is that any different?

23         MR. KEKER:  One of the ironies about this is that

24   there are lots of ways to get the information, and some of

25   them are legal and some of them require a warrant.  And that's

1   what we're saying.

2          So, to the extent that they could get the

3   information other ways by visual surveillance, by having an

4   informer inside the house, by getting the roommate to tell

5   them what's going on at all times, I mean, those things are

6   different.

7          THE COURT:  But again, you're going into areas that

8   they're not requesting, having a roommate saying what's going

9   on in the house, having someone else tell them where he is at

10  all times.  That's not what--  Or what he's doing at all

11  times, I think you said.  That's not the kind of information

12  the Government was seeking.

13         MR. KEKER:  The Government here--

14         THE COURT:  What they're seeking, I think you

15  admitted, it's location data and timing data, stuff that they

16  could have observed but for the fact that that would be

17  impractical.

18         MR. KEKER:  Yes.  But that applies, I suppose that

19  applies to every Fourth Amendment case.  There usually is some

20  other way if something else happens--

21         THE COURT:  Well, I understand what you're saying,

22  but you keep stepping into beyond what I think this order is

23  directed to by implying that they are trying to get

24  information about what these petitioners are doing inside

25  their house other than just sending a public tweet.  Or inside

1  another, inside their office other than sending a public

2  tweet.

3          MR. KEKER:  I don't mean to do that.  But what I'm

4  saying is that using the mechanism that they are seeking in

5  this order, namely a 2703(d) order--

6          THE COURT:  Right.

7          MR. KEKER:  Is, amounts to a search under the Fourth

8  Amendment because of the nature of the information that

9  they're seeking about what's happening inside the house.

10         And that information about what's happening inside

11 the house could have been obtained other ways, you're right.

12 And it's not that the information is automatically protected,

13 kind of protected no matter what.  It's protected from the

14 Government searching for it this way without a warrant.  It's

15 covered by the Fourth Amendment.  That's what I'm--

16         THE COURT:  All right, I understand.

17         MR. KEKER:  I'm saying.  And I'm not attempting to

18 exaggerate what they're learning inside the house.  They are

19 learning where you were when you were doing all this tweeting,

20 and they are learning it over a long period of time.

21         THE COURT:  Okay.  That's essentially it.

22         MR. KEKER:  Yes, ma'am.

23         THE COURT:  Okay.

24         MR. KEKER:  And to get it this way is a search under

25 the Fourth Amendment.  That's our position.

15

1          And to avoid, to avoid reaching that or dealing with

2     that, or dealing with the arguments that they make about, oh,

3     there is no expectation of privacy because of this or that, to

4     avoid that we're asking that you apply the statutory remedy of

5     vacating the order because they didn't make an adequate

6     showing.  And then we don't get in, you don't have to write a

7     Fourth Amendment opinion about this, I guess is what I'm

8     saying.

9          The Government does say with respect to what we're

10    talking about right now, that there is simply no expectation

11    of privacy about your whereabouts when you're logging onto

12    Twitter.  And to just nail the point, Karo, Kyllo, Maynard are

13    all cases that we've cited that say otherwise.

14          If there is a question about whether or not there is

15    an expectation of privacy in this information, then there

16    ought to be a much bigger showing than the one that we have

17    here where both sides are saying what they think the

18    expectation of privacy is.

19          We think it would require a hearing like the Third

20    Circuit told the magistrate judge in the Third Circuit opinion

21    to do.  And you'd have to figure out a couple of things.  One

22    is that you would have to figure out what people expect with

23    respect to whether or not the Government can track their

24    movements and association in the way that this order does.

25          As Justice Scalia said in Kyllo, this expectation of

1   privacy rubric that we've all heard since 1967 in <u>Katz</u> is sort

2   of circular.  I mean, it becomes what the courts say it is.

3          But what our point is, that this is not phone

4   records where you know on your bill you're going to get a bill

5   that says who you've called.  I mean, it's not bank records

6   where the courts have talked about voluntarily turning things

7   over.  This is something different.

8          Nobody--  And in a hearing we believe we could show

9   that not nobody, but most people, the vast majority of people

10  have no idea that Twitter collects the information about their

11  whereabouts and--

12         THE COURT:  Well, your clients seem like pretty

13  knowledgeable people, and they did agree to Twitter's privacy

14  policy, did they not?

15         MR. KEKER:  They--  I wouldn't accept that they

16  agreed to Twitter privacy policy.

17         THE COURT:  They were informed of it at any rate--

18         MR. KEKER:  They went ahead with Twitter in the

19  face--  I have had those things pop up on my screen every time

20  I have gotten a new program.  I think their--  I have--

21         THE COURT:  So, you don't read them?

22         MR. KEKER:  I have never read the whole thing.  So,

23  saying that they agreed to it, it was jammed down their

24  throat.  Yes, it appeared on their screen, there is no

25  question about that.

1          THE COURT:  Well, it would be a condition of

2    creating a Twitter account, would it not?

3          MR. KEKER:  Correct, that's true.

4          THE COURT:  Okay.  And they agreed to that, correct?

5          MR. KEKER:  They created a Twitter account, that's

6    certainly true.

7          THE COURT:  All right.  Subject to that.  Okay.

8          MR. KEKER:  And that is one factor, I totally agree,

9    that would be as useful factor for the Government in this

10   hearing where you tried to figure out what a reasonable

11   expectation of privacy is.  But I would argue that there would

12   be ways to overcome that.

13         This is something really sort of brand new which, if

14   allowed, permits the Government to know a lot more

15   electronically than people are used to them knowing.  When

16   you're at home, when you're at your office, when you're

17   elsewhere, what you're saying when you are at those places.

18         So, our position is that if the Fourth Amendment

19   argument needs to be addressed, there ought to be a hearing on

20   the Fourth Amendment to determine what the reasonable

21   expectation of privacy is and whether or not society can

22   tolerate that reasonable expectation of privacy, which is the

23   other prong.

24         THE COURT:  All right.

25         MR. KEKER:  So, unless you want, unless there is

1   more to talk about on the Fourth Amendment side--

2           THE COURT:  What authority do you have for the

3   noncitizens living abroad having rights under our

4   Constitution?

5           MR. KEKER:  The Constitution as I understood--  The

6   case that the Government cites, as you know, of course, deals

7   with a kidnapping and virtual mugging that happened outside

8   the United States in Mexico.  It's my understanding that the

9   Constitution of the United States applies to things that

10  happen in the United States.

11          This is an order issued by a United States court

12  which is bound by the Constitution to a U.S. company which is

13  covered by the Constitution whose records are all in the U.S.

14  where they are covered by the Constitution that affects United

15  States citizens like my client, Mr. Applebaum, who is,

16  needless to say, protected by the Constitution.  And the fact

17  that some non-American citizens participate in this gathering

18  or are part of this gathering of information doesn't make the

19  Constitution go away.

20          THE COURT:  Okay.

21          MR. KEKER:  And we believe that the Constitution

22  applies fully to these Twitter records.  We think that

23  Twitter, if they were here, would want it to.

24          And the idea that American-based social networking

25  systems or server systems or Internet systems, which by

1  definition, operate in cyberspace all over the world, aren't

2  protected and their records aren't protected by the U.S.

3  Constitution is, we believe is wrong.

4          THE COURT:  Okay.  I understand.  Thank you.

5          What's the Government's opposition to this?

6          MR. KEKER:  And there are cases cited at footnote 9

7  of our reply brief --

8          THE COURT:  Okay.

9          MR. KEKER:  -- that we think answer that question.

10  So, let me move very briefly to the first--

11          THE COURT:  Oh, I'm sorry, I thought you were

12  finished.  Go ahead.

13          MR. KEKER:  I'm almost finished, Your Honor.

14          THE COURT:  Okay, go ahead.

15          MR. KEKER:  Let me talk briefly about the First

16  Amendment.  There can't be much question that the original

17  order seeks information about associations.  In NAACP versus

18  Button a Government subpoena that asked the NAACP for all, a

19  list of its members was challenged under the First Amendment.

20  In that case there were other ways that they could have gotten

21  the information, but the subpoena was challenged because it

22  unnecessarily burdened the rights of association.  Our

23  argument here is somewhat, is somewhat the same.

24          The original order seeks information that really

25  could map your affinity groups, who you communicate with, when

1  you communicate with them, from where you communicate with

2  them.  It really does allow a mapping of who your association

3  is.

4          And again, I am back to Egypt, Tunisia.  I mean,

5  imagine if the Government, and I think the Government did try

6  to get that information because it's incredibly useful to know

7  what the political opposition is doing and who they are

8  talking to and when.  When those groups are brought together

9  on social networks around an issue, whether it's the

10 revolution in Egypt or Wikileaks or any other political event,

11 the First Amendment has to come into play.

12         How much Government--  And the question is how much

13 Government surveillance and mapping of the affinity groups

14 does it take to chill the First Amendment rights of free

15 speech and association?  If I learn that by communicating with

16 Jake Appelbaum or following Jake Appelbaum or learning his

17 political views Big Brother will have my name in a file, will

18 I stop paying attention to those tweets?

19         So, at a minimum we believe that Fourth Circuit law

20 and U.S. law requires a balancing of what the chill on the

21 First Amendment rights of association and free speech are

22 against the Government's need for the information.  And it

23 can't just be blithely ignored by calling them business

24 records.

25         You have got to ask, I mean, how much chilling of

1  speech is there?  Is the order too broad?  Does the Government

2  need all these documents?  Does it outweigh the chilling of

3  speech?

4          And again, that leads to a hearing.  And again, that

5  leads to the doctrine of constitutional avoidance, which we

6  think is best answered by simply vacating the order, letting

7  the Government regroup, figure out what it wants to do.  It

8  has other ways to get at least some of this information, as

9  you know.

10         And with that, Your Honor, if I don't have any, if

11 you don't have any questions, I will sit down.

12         THE COURT:  I don't.  Thank you.

13         MR. KEKER:  Thank you.

14         THE COURT:  Why don't we go ahead and have Ms. Cohn

15 argue the motion to unseal.

16         MS. COHN:  Your Honor--

17         THE COURT:  Are you not--  I'm sorry, you're not

18 arguing--

19         MR. COHN:  My colleague, Mr. Fine, is going to argue

20 the part of the motion to unseal that you--

21         THE COURT:  Okay, Mr. Fine.  I'm sorry, you're

22 right.  I did write that down.  Sorry.

23         MR. FINE:  Good morning, Your Honor.

24         THE COURT:  Good morning.

25         MR. FINE:  Aden Fine.  And once again, I'm going to

1    be speaking on behalf of all the movants here.

2              THE COURT:  All right.

3              MR. FINE:  And this motion to unseal deals with our

4    attempt to unseal the remainder of the documents that were

5    associated with the December 14 order to Twitter.  And as

6    well, we are seeking to unseal any other similar orders and

7    applications that were issued to other companies.

8              Your Honor, this motion deals with the Government's

9    attempt to obtain private information about Internet

10   communications and the Government's attempt to do so in

11   secret.

12             They shouldn't be able to get this information in

13   the first place, as Mr. Keker just explained.  But above all,

14   they shouldn't be able to do so in secret.  That's not how our

15   system works, and it shouldn't be permitted here.

16             In our judicial system there's a clear presumption

17   of open access to court documents.  And it's the Government's

18   burden to overcome that clear presumption.  They haven't met

19   that burden here and they can't meet it here.

20             In these specific circumstances with these specific

21   documents, the Government cannot demonstrate that its

22   interests in maintaining secrecy here heavily outweigh both

23   the movants' and the public's significant interest in

24   obtaining access to these documents.

25             And before we get into the law, I think it's

1   important to understand exactly what's at issue here and who's

2   involvement.  The movants are three individuals who, like many

3   people, use the Internet to communicate with individuals

4   around the world on a variety of different subjects.

5        These individuals have apparently been swept up in

6   the Government's investigation into the Wikileaks Web site.

7   That investigation has been extremely high profile both here

8   and around the world.  And it's safe to say that the entire

9   world is watching to see what the American Government's

10  response and what our courts' responses will be to this highly

11  controversial and politically charged matter.

12       And this is not just an ordinary request for

13  information by the Government either.  Here the Government has

14  chosen not to use a warrant, but to obtain a court order based

15  on showing less than the probable cause that would have been

16  required to get a warrant.  And they have done so, as Mr.

17  Keker just explained, in order to get detailed information

18  about individuals' Internet communications, including private

19  information such as who they direct messaged with.  Which is

20  Twitter's way of private messaging.

21       So, in these circumstances, Your Honor, the

22  Government's burden to overcome the clear presumption of open

23  access is especially high, and they haven't met that burden

24  here for several reasons.  First, the Court has already

25  unsealed the Twitter order.  And the Court has already

1    determined, based on the Government's request to do so, that

2    it's in the best interests of the Government's investigation

3    to remove that secrecy.

4            Given that, there is no reason, let alone a

5    compelling reason, why the Government needs to maintain

6    secrecy over the rest of the Twitter dockets and over the

7    other similar orders and applications.

8            The disclosure of the Twitter order has revealed two

9    key facts.  First, it's confirmed that there is this

10   investigation.  It's confirmed the existence of the

11   investigation.

12           Second, and critically, it's confirmed that the

13   Government is attempting to get information about movants'

14   communications.

15           Those two facts are critical because as a result of

16   them, the traditional reasons for secrecy, such as not wanting

17   to tip off witnesses or subjects or targets, not wanting to

18   risk the potential destruction of evidence, and not wanting to

19   risk potentially exposing innocent parties to the public's eye

20   and to the public scrutiny, none of those traditional reasons

21   for secrecy are still present here.

22           And as a result, the Government simply cannot meet

23   their burden.  And that's common sense, but it's also the

24   clear law.  And the Fourth Circuit Court has made clear that

25   when information is already publicly known, the Government

25

```
1   cannot have a compelling interest in keeping secrecy over that
2   information.  And that's the Virginia state, the Virginia
3   Department of State Police case makes that clear, Your Honor.
4           Simply put, the Government can't have it both ways.
5   They can't say on the one hand it's in the best interests of
6   the investigation to remove the secrecy and then turned around
7   and say, but we still need to keep everything secret.  They
8   simply can't do that here, Your Honor.
9           And because the Court has already determined that
10  it's in the best interests of the investigation to remove the
11  secrecy, the Government simply cannot meet their burden.
12          THE COURT:  Don't you think that there is a
13  difference though between revealing the existence of an
14  investigation and the details of what the Government is
15  looking at?
16          MR. FINE:  Of course there is a difference, Your
17  Honor.
18          THE COURT:  Sure.  And wouldn't that be a problem
19  with regard to releasing the contents of the affidavit?
20          MR. FINE:  The release of the order itself has
21  revealed those two key facts.  Not just that there is the
22  existence of this investigation, but it's revealed what
23  information the Government is seeking.  They are seeking
24  information about movants' communications.
25          As a result--
```

1          THE COURT:  But the basis for that and why the

2     Government is seeking that information, why wouldn't that be

3     subject to--  Because it's the reason for the investigation,

4     because it's the basis for asking for this, the details of the

5     investigation.  Why wouldn't that be subject to being held

6     private at this point--

7          MR. FINE:  The only reason, the only reason that

8     that information is ever held subject to secrecy is if it's

9     necessary to accomplish the traditional reasons.  You don't

10    want to tip people off.  You don't want somebody to go out and

11    destroy evidence.

12         THE COURT:  All right.

13         MR. FINE:  You don't want to expose innocent people

14    to the public's eye if they are eventually not going to be

15    prosecuted.

16         None of those reasons are present here because they

17    revealed the Twitter order.  We now know they are trying to

18    get this information.

19         If any of these risks--  If there were any need for

20    secrecy, that would have existed before the Twitter order was

21    released.  Now that it's released, everything has changed,

22    Your Honor.  And the only thing that remains is just facts.

23         This is not, we're not trying to get into the

24    Government's investigative files or into grand jury

25    proceedings.

1        THE COURT:  Well, wouldn't you be doing that by

2   asking to have this order, to have the affidavit released?

3   Which would presumably detail why the Government is looking at

4   the associations and why that's pertinent to their

5   investigation.

6        MR. FINE:  Yeah, but, Your Honor, the Government is

7   not entitled to secrecy over facts just because they don't

8   want the other side to know them.  There has got to be a

9   reason for that.  Our system isn't based on secret evidence

10  and secret trials.

11       THE COURT:  Well, that's the whole point though.  We

12  aren't at the point of a trial.  This is just the

13  investigation.

14       And I think, don't you think that there is a

15  different standard there in terms of the Government having to

16  release everything that it already has established in an

17  investigation or suspects in an investigation and the reasons

18  for why they want more information?

19       MR. FINE:  We're not asking for everything that they

20  have.

21       THE COURT:  Well, that's what you're asking for if

22  you ask me to unseal that affidavit.

23       MR. FINE:  We're asking for everything that they

24  gave the Court to persuade the Court to issue a judicial

25  order.

28

1          THE COURT:  Right.  What's the difference?

2          MR. FINE:  There is a big difference, Your Honor.

3    We're not trying to conduct discovery here.  We're trying to

4    know what are the facts that the Court was given by the

5    Government --

6          THE COURT:  Yes.

7          MR. FINE:  -- to reach its conclusion.

8          THE COURT:  Why is that not, why does the Government

9    not have the right to have that private, to have that secret

10   at this point when there has been no charges brought, nothing

11   that involves these petitioners that would, you know, elevate

12   this to the next step where you would have the right to see

13   that?

14         MR. FINE:  Your Honor, the Fourth Circuit has made

15   clear that just because something is an ongoing criminal

16   investigation, even preindictment, that's not sufficient to

17   warrant the extraordinary measure of sealing documents.

18         Here the Government has failed to show why in these

19   specific circumstances with these specific facts postrelease

20   of the Twitter order, why they still need secrecy.  And the

21   Fourth Circuit has made clear that absent that specific

22   showing, it's improper to seal documents.  And that's why

23   we're here, Your Honor, why we're asking you to do this.

24         THE COURT:  I understand.  Thank you.

25         MR. FINE:  The only real fact that the Government,

1    the only real risk that the Government points to that might

2    unfold if the rest of these documents are unsealed is that

3    they claim that it hasn't yet been publicly confirmed who

4    these other companies are that may have received these other

5    orders.  But that normal risk of witness intimidation or

6    witnesses fleeing is simply not present here, Your Honor.

7         The companies that likely received these other

8    orders are huge companies over whom the movants have little or

9    no influence.  These companies are not going to flee and they

10   are not going to destroy evidence just because we're here

11   seeking to unseal these documents.

12        Besides, if there were any risk that the movants

13   would attempt to influence these companies, which they are not

14   going to do, but if there were any risk, that would have been

15   caused by the Government unsealing the Twitter order in the

16   first place.  Movants obviously know which other companies

17   they have accounts with.

18        So, there is no--  The key I guess here, Your Honor,

19   is there is no additional risk that would be posed by

20   unsealing these additional documents.

21        The second reason why the government cannot meet its

22   burden here, Your Honor, is that movants have a strong reason

23   for needing these documents unsealed.  They need these

24   documents unsealed so that they can properly challenge the

25   underlying orders which, in our view, implicate their

1    constitutional rights.  Absent unsealing both the Twitter

2    application and the other applications and orders to other

3    companies, movants will effectively be prevented from doing

4    so.  And that's simply not permissible, Your Honor.

5         The final reason, and this is a critical reason why

6    the Government cannot overcome their burden, their heavy

7    burden in these circumstances, is that the public has an

8    immense interest in having these documents unsealed.

9         As I mentioned, this investigation has sparked an

10   intense national and international debate over what the proper

11   response is to this Wikileaks Web site.  And it's safe to say

12   that this story has consumed the press, the American public

13   and the current administration.  And unsealing these documents

14   would greatly contribute to the public's ability to

15   meaningfully participate in this ongoing debate.  And it would

16   greatly benefit the public to have a better understanding of

17   what our Government's response has been and what our courts'

18   responses have been.

19        And unsealing these documents would also ensure that

20   the judicial process is functioning properly.  That Government

21   is not overstepping its bounds.  That reasoned and appropriate

22   decisions are being made.  And that fairness and justice are

23   occurring and that they are not being sacrificed just because

24   this is a highly controversial and charged matter.

25        Those are the reasons why for decades the Supreme

1   Court and the Fourth Circuit have made crystal clear there is

2   a reason why our judicial system is open.  And the reason is

3   that we need to allow the public to serve as that watchful eye

4   on our Government's operations and our courts.

5          And the Government is trying to avoid that here.  I

6   understand we don't know all the facts that they have

7   presented in their affidavits, but just because they don't

8   want us to know that isn't a sufficient reason under the clear

9   case law for sealing that information.  They have presented it

10  to the Court, and the public and movants are entitled to get

11  that information.

12         On the other side of the balance, what the

13  Government's argument essentially boils down is simply they

14  broadly assert that this is an ongoing criminal investigation,

15  it's preindictment, and that, therefore, there must be secrecy

16  per se no matter what.

17         But the Fourth Circuit Court has made clear that

18  that is not a sufficient reason to overcome the Government's

19  heavy burden of justifying closure.  And again, in the

20  Virginia Department of State Police case, which is at 386 F.3d

21  567 at 579, the Fourth Circuit made clear that although there

22  is a general interest in maintaining the integrity of ongoing

23  criminal investigations, that enough is not sufficient to

24  warrant sealing documents.

25         Instead, the Fourth Circuit made clear the

1   Government has the burden, and again they haven't done that

2   here, of showing specific facts and specific reasons why this

3   particular investigation will be compromised if the remainder

4   of the documents are unsealed.

5          Given that we already know the Government is

6   attempting to get movants' information and that we already

7   know about the existence of this criminal investigation, the

8   Government simply can't meet that burden.

9          One final point, Your Honor.  It appears that there

10  is still not a public docket for any of these materials that

11  we're discussing here today.  And the absence of that public

12  docket is simply not permissible.

13         And the Fourth Circuit Court has made repeatedly

14  clear, and it's very clear in a long line of cases, that

15  judicial records need to be put on the public docket in a

16  manner sufficient to provide the public with notice that the

17  Government is attempting to seal certain things in a

18  sufficient manner to provide the public with an opportunity to

19  challenge or to object to such sealing.

20         And that principle holds true even in time

21  sensitive, otherwise secret matters such as search warrant

22  proceedings, and the Baltimore Sun versus Goetz case makes

23  that crystal clear.

24         In those kinds of situations that otherwise would be

25  kept secret, the Court doesn't necessarily need to docket the

1   material in advance of sealing the materials, but the solution

2   that the Fourth Circuit came up with, and it makes perfect

3   sense, is once the order is sealed, once there is any sealing,

4   you have got to put that on the public docket so that anybody

5   can come in and say, wait a second, why is this sealed?  I

6   object.  That hasn't been done here, and it needs to be done,

7   Your Honor.

8           So, movants request that the Court at a minimum

9   order that the docket, that there be public docketing of all

10  the materials that were associated with the December 14 order

11  to Twitter, and that there be public docketing for all the

12  other orders that the Government obtained and all the other

13  applications that the Government submitted in order to get

14  those other orders.

15          We still don't know about those documents, or I

16  assume they were all put under seal, but the solution is the

17  Court has to order the Clerk's Office to put all those on the

18  public docket.

19          THE COURT:  Okay.

20          MR. FINE:  Thank you, Your Honor.

21          THE COURT:  Thank you, Mr. Fine.

22          Who is arguing this for the Government?

23          MR. DAVIS:  Your Honor, I will address the motion to

24  vacate.  Mr. Peterson will address the unsealing issues.

25          THE COURT:  All right.

34

1          MR. DAVIS:  Your Honor, the parties have stated that

2     something brand new is happening here.  And, of course, as

3     this Court knows, nothing of the kind is occurring.  This is a

4     routine 2703(d) application and order, lawful in all respects

5     for subscriber information and for connection records.

6          There is no content involved.  There are four

7     accounts identified.  There is a six-and-a-half month period

8     particularized in the affidavit.  There is nothing burdensome,

9     there is nothing voluminous, and there is nothing required of

10    the parties here.

11         This is a standard, as this Court knows very well,

12    investigative measure that is used in criminal investigations

13    every day of the year all over this country.  And we don't

14    back away from that.  This is a routine 2703(d) case.

15         I'd just make a few points.  One is that the parties

16    say almost nothing about the standing limitations.  And this

17    is an unusual statute in that there is a very clear standing

18    statute right in the Electronic Communications Privacy Act.

19    Section 2708 says that non-constitutional grounds cannot be

20    raised.

21         And so, although the parties say we raise first and

22    foremost a statutory challenge, the same statute says they

23    can't do that.  And there is good reason for that.  It's

24    because Congress has designed an ex parte proceeding that

25    allows for efficient resolution of criminal investigations and

1    does not allow for parties to bring what are like motions to

2    suppress and long inquiries about those decisions in the first

3    instance.

4          The subscribers only have the remedies in that

5    statute.  And in this noncontent case, they're not even close

6    to having a statutory remedy.  And we would urge the Court to

7    make that clear in resolving this matter.  There is no

8    standing here to raise a statutory claim.

9          As for the statutory challenge, this Court has

10   already determined based on the application filed that there

11   are specific and articulable facts that meet the standard in

12   the statute, and that is as it should be.  The Court has made

13   that finding.  There is no motion to suppress allowed here.

14         And the parties' best argument is, well, maybe there

15   is connections that someone has made that don't relate to the

16   criminal investigation.  And I would say that is a certainty

17   here.  That is, there are, I am sure, connection records of IP

18   address connections to the Internet that turn out to have

19   nothing to do with the criminal investigation.

20         But again, that is, as it should be, an efficient

21   and fair criminal investigation.  And these records are no

22   different than when a grand jury subpoenas telephone toll

23   records and gets a bunch of phone calls, not all of which are

24   relevant and material to the case.  Or a bunch of credit cards

25   that show transactions, only some of which are relevant.

1          But surely the law does not require and certainly

2     the providers of this world don't want a regime where only,

3     where a relevancy decision has to be made at the outset.

4     That's not the way investigations function.  There is no

5     reason it should function that way here.

6          Your Honor, the parties make much of the Court's and

7     urge the Court to exercise its discretion to even if, assuming

8     that the Government has met the specific and articulable facts

9     standard, to exercise its discretion to say, well, in this

10    case we think the Government should have to provide more, it

11    should have to provide probable cause and meet the Fourth

12    Amendment standard.  And they base that argument, of course,

13    on the Third Circuit opinion.

14         We think, respectfully, that the Third Circuit

15    opinion is unsatisfactory in that respect.  And we think even

16    the concurring opinion in that same opinion makes clear that

17    it is an unworkable situation for magistrate judges around the

18    country where there are no standards and a judge has the

19    discretion to say, well, here we're going to require more even

20    though the Government has met the standard.

21         And that's not to say the Court doesn't have

22    discretion.  Of course the Court has discretion to make or not

23    make orders under 2703(d) for lots of reasons.  For instance,

24    the Court could say, well, you've met the factual showing, but

25    this is an unusually voluminous court order, or the amount

1   you're asking for is too much, or there are other undue

2   burdens.  Those kinds of considerations are right in the

3   statute.  Of course the Court retains discretion to determine

4   those kinds of issues.

5          What the Court doesn't have discretion to do is to

6   change the rules in the middle of a 2703(d) proceeding and to

7   say, I acknowledge that you have met the factual threshold

8   required in the statute, but I am going to raise the bar.  And

9   that, that is not, that's the opposite of reasoned discretion,

10  and it's the opposite of the rule of law.

11         And we strongly believe that the Third Circuit

12  opinion in that respect is not destined to be celebrated and

13  emulated in other courts around the country.

14         Turning now to the Fourth Amendment argument.  Our

15  argument is quite simple.  This case is controlled by Smith v.

16  Maryland.  Just as in pen registers from a land line phone

17  inside a home, there is no Fourth Amendment issue.

18         So too are the IP address records here in the same

19  guise.  We also say, as two Courts of Appeals have already

20  said in Forrester and Christie, there is no reasonable

21  expectation of privacy in voluntarily conveyed IP addresses.

22         It's a remarkable argument and an excellent--  There

23  is a lot that is being done in this argument, and I admire it

24  in many ways, but what the defendants are doing is they're

25  weaving together two strands of Fourth Amendment law.  One is

1    the Karo and Kyllo strand that has to do with the private, the

2    private events that occur in one's own home.

3           And the second strand of Fourth Amendment law is the

4    privacy interest in public movements and going around and

5    moving from place to place that come up in cases say involving

6    GPS and tracking devices.

7           And the two doctrines are woven together, but

8    consider the argument just briefly.  First of all, IP

9    addresses don't show location with precision.  This is not

10   location information in the same sense that GPS information

11   is.  It is less geospecific than things like a land line phone

12   telephone call is, or certainly a tracking device.

13          Also, Karo and Kyllo involve surreptitious

14   technology that was implanted by the Government.  I mean, Karo

15   is the tracking device that was put inside the can of ether

16   and painted up, and this is a big surreptitious step by the

17   Government.

18          That is completely absent here.  The Government

19   hasn't done anything.  These are just ordinary computers that

20   are functioning the way everyone knows computers function.

21   There is nothing secretly installed here.  And to say that

22   this raises a Karo issue is creative to say the least.

23          We also think that the, that routinely subpoenaed

24   phone, routinely subpoenaed records, including phone records,

25   show activity in a home much better than these IP address

1    connection records, again as in land line phones.  Or

2    traveling is shown in credit card record cases where

3    transactions show where someone was and making what purchase

4    or ATM deposit or whatever it is.  Those kinds of things are

5    subpoenaed all the time, and we don't hear that this is a

6    Fourth Amendment violation.

7         We also commend to the Court footnote 2 in Bynum.

8    The Fourth Circuit Court hasn't said much about this, but it

9    has said in the Bynum case that IP addresses are, quote,

10   numbers that Bynum never possessed.

11        I mean, the Fourth Circuit is looking at IP

12   addresses and noting that IP addresses are generated

13   automatically by an ISP.  And, of course, in a dynamic IP

14   address situation, they are assigned from a battery of numbers

15   and they change all the time.

16        To say that Bynum possessed this number, that it's a

17   paper in effect under the Fourth Amendment, is a bit of a

18   stretch.  And again, the Fourth Circuit doesn't make a holding

19   there, but it is--  Again, to say that an IP address is

20   possessed even in the same way that a phone number is

21   possessed, is taking it far.

22        Lastly, Your Honor, about the Fourth Amendment.  As

23   to the Third Circuit case, there is a great deal made of the

24   Third Circuit opinion in the parties' excellent papers in this

25   case.  But note what the case actually does.  It rejects the

1    conclusion that a search warrant is required for cell site

2    location information.  It cannot accept the view of the

3    magistrate judge in that case that cell site location

4    information can be considered information from a tracking

5    device.

6         It finds no evidence that historical CSLI as it is

7    called, even when focussed on GPS cell phones, extends to

8    privacy interests in the interior of the home.  And it holds

9    that cell site location information is obtainable under

10   2703(d) without probable cause.  That is, the holding of that

11   case is not at all, doesn't get the defendants or the parties

12   very far.

13        So, we think that Smith v. Maryland is clear.  The

14   Courts that have looked at this have made that holding.  And

15   we would urge the Court to do the same.

16        As to the First Amendment, I will only say, this is

17   not about association rights.  And it's not about politics.

18   It's about facts and evidence.  And certainly communications

19   among people may show associations, but the Government in this

20   case is not seeking a membership list.  It is focusing on four

21   Twitter accounts.  It is a subpoena not to these subscribers.

22   It is to an American corporation for business records.

23        It is not for content.  It doesn't have anything to

24   do with the speech in the case.  And it is only a search for

25   what are like toll records from a phone company.

1              And it also is about things that are of their nature

2    public statements.  Tweets are public statements uniquely and

3    widely available.

4              There is no showing of overbreadth.  This is a

5    narrowed 2703(d) order.  There is no showing of bad faith, and

6    the parties don't allege that.

7              And so, we reject--  To some extent it's hard to

8    discern what is the First Amendment claim that the parties are

9    makings.

10             Lastly, Your Honor, I wanted to address very briefly

11   the international comity question which pertains to Ms.

12   Jonsdottir who is a member of Parliament in the nation of

13   Iceland.  I wanted to make clear that we do not agree and

14   concede, as is stated in the reply brief, that this order

15   would violate Icelandic law.  We don't think the parties have

16   made that showing.

17             They have shown that there is an article in the

18   Constitution that says that a legislator may not be subject to

19   custody, and a criminal action may not be brought against that

20   legislator.  This is not a criminal action against Ms.

21   Jonsdottir or anyone else at this point.

22             It also says that no member of the Parliament may be

23   held accountable for statements made by that person in the

24   Parliament except with consent.  But this is not about

25   Parliamentary statements or Parliamentary events.

42

1          This is a case where Ms. Jonsdottir's status as a

2     Parliamentarian is incidental and not integral to the

3     investigation into the facts sought.  And there is no hardship

4     or burden on Ms. Jonsdottir as a Parliamentarian or on the

5     Parliament of Iceland by this 2703(d) order.

6          But we think that the international comity issue

7     here is much easier than that in say the <u>Bank of Nova Scotia</u>

8     cases that involve subpoenas for bank records that are

9     overseas where U.S. courts routinely say that even though

10    there is a bank secrecy law in Germany or in the Cayman

11    Islands, the grand jury in America has a right and a duty to

12    investigate serious crime.  And the American court applies

13    U.S. law to allow that.

14         Here, of course, this isn't, these aren't records

15    overseas.  We don't see a violation of Islandic law.  And a

16    fortiori, we think international comity does not block the

17    right of the Government to investigate these matters.

18         THE COURT:  All right.  Thank you.

19         MR. DAVIS:  So, unless the Court has questions--

20         THE COURT:  No, I have no further questions.

21         MR. DAVIS:  Thank you.

22         THE COURT:  I will hear argument on the motion to

23    unseal.

24         MR. PETERSON:  Good morning, Your Honor.

25         THE COURT:  Good morning.

1          MR. PETERSON:  Andy Peterson.  Because I have the

2    benefit of going last, I will also try to bear the burden of

3    being brief.

4          THE COURT:  Okay.

5          MR. PETERSON:  At root, the subscribers basically

6    want to turn the common law right of access to judicial

7    documents into a right to notice when a 2703(d) order or other

8    process has been issued against them.

9          Even if that common law right of access exists, it

10   doesn't require unsealing the sealed application in this

11   instance or, to the extent they exist, other sealed records

12   when a criminal investigation is ongoing long before any

13   charging decision is made.

14         I think that's supported by clear Fourth Circuit

15   case law.  In the Baltimore Sun case cited by the movants, the

16   court said that a search warrant affidavit after it's

17   executed--  And clearly there is some public notice after the

18   execution of a search warrant--  In fact, the aggrieved party

19   may know that the search has occurred.  But sealing of the

20   affidavit can be justified long past the execution of the

21   warrant because it can disrupt ongoing investigations or it

22   may describe continuing investigations.

23         In addition, in Media General Operations versus

24   Buchanan, the Fourth Circuit also acknowledged that a search

25   warrant affidavit could be sealed because it could contain

44

1    sensitive details of ongoing investigations.

2            And at least as to the affidavit, which is a

3    document, or the application which the Government acknowledges

4    exists, we think that those harms are present here.  That

5    application, the release of it, it contains, obviously as has

6    been described and the statute describes, a specific, a

7    statement of specific and articulable facts regarding why the

8    records sought are relevant to the investigation.  Release of

9    those facts, and those facts have not been made public, would

10   damage the ongoing investigation.

11           The Virginia Department of State case which is cited

12   by the movants actually recognized that one compelling

13   government interest that's justified in protecting is the

14   protection of facts in an investigation that had not been made

15   public.

16           And that case which they rely on significantly is

17   quite different from the case here.  It was a civil action

18   brought by a person who had been wrongfully imprisoned.  And

19   the documents at issue had actually been discovered to the

20   plaintiff under a protective order.  And in the midst of

21   litigation, the Government had waived or at least publicized a

22   number of those documents already.

23           And that's not what we have here.  The movants have

24   said that the Government in agreeing to the release of the

25   original order had waived any harm that could come, but the

1   facts that are in, the specific and articulable facts as

2   pointed out by Your Honor are of a different kind than what

3   has already been released.  And it's the Government's

4   position, and we think well supported by the case law, that

5   the release of those facts would cause damage to the ongoing

6   investigation.

7          There is no procedural error here because there is

8   no argument, at least not in oral argument, that the 2703(d)

9   proceeding is conducted ex parte.  And Baltimore Sun indicates

10  that when that type of proceeding occurs, and this is

11  consistent with Local Rule 49, that when a sealing order is

12  issued, it's issued after the judicial order is entered and

13  docketed that shows its nature as a motion to seal.

14         That's basically what occurred in this case briefly

15  on the docketing issue.  It's unclear to me at least when you

16  go to the public docket now and enter this case number in, you

17  get a response of under seal.  And that's all that the public

18  is entitled to in the sense that when a pen register is

19  docketed or a search warrant, and that's exactly what was at

20  issue in Media General Operations.  What's usually docketed is

21  simply the application and the order.  There is no back and

22  forth.  It is an ex parte hearing.

23         The public docket indicates that a sealing order has

24  been filed.  And that's sufficient under Federal Rule of Civil

25  Procedure or Criminal Procedure 55 and the Fourth Circuit

46

1   Court's decision in Media General Operations.  In that case

2   search warrants were docketed the same way by this Clerk's

3   Office.  A notation was made that a search warrant had been

4   executed and that the affidavit was filed under seal.  And

5   that was sufficient public notice for the Fourth Circuit.

6          In terms of the presumption of access and the

7   benefit to the investigation, I would just like to point out

8   that this is substantively different from any of the cases

9   that the plaintiffs have cited or the movants have cited about

10  public access.  It's in the middle of an investigation, in

11  fact in the preliminary stages of an investigation.

12         And unlike a search warrant, the right that the

13  plaintiffs assert, a search warrant is executed.  And when the

14  sealing order is docketed after the Government has collected

15  the information, the aggrieved party can come back and

16  litigate the issue.

17         Here the movants want to intervene prior to any

18  collection or prior to actually the investigative tool

19  issuing.  And the Supreme Court in SEC versus O'Brien, as well

20  as this court or the Fourth Circuit in In Re swearing in, held

21  that even the existence of a right does not provide a

22  substantive procedural right to notice that process has been

23  issued.

24         We think that that applies to the other sealing

25  orders to the extent they exist if they are out there.  And

1   that the fact that unsealing of those documents would reveal

2   public facts or facts that have not been made public is a

3   sufficient compelling interest at this stage to keep the

4   documents sealed.

5         THE COURT:  All right, thank you.  Did the

6   petitioners have anything to add in rebuttal?

7         MR. KEKER:  Yes, Your Honor.  Briefly.  I have got

8   five points to respond to Mr. Davis.  Let me start with the

9   first one, which is standing which he raised, and I didn't, I

10  didn't talk about.

11        The Government seems to think that you cannot

12  challenge, make even a constitutional challenge to, as an

13  aggrieved party to an order to compel production to a third

14  party.  That is simply wrong.  Eastland versus U.S.

15  Servicemen's Fund was cited in our brief.

16        But more importantly, the statute that he pointed

17  to, 18 U.S.C. 2708, talks about these are exclusive judicial

18  remedies for non-constitutional challenges.  It should be, I

19  believe, obvious that asking a court of the United States to

20  stop something that has constitutional consequences and that

21  may be unconstitutional, is something that a party has a right

22  to do.

23        So, we think that their argument about the, about no

24  standing is simply irrelevant and wrong.

25        The second point I wanted to make is the admission

1    that he makes.  He said blithely after saying that you can't

2    challenge what we're doing, he said of course a lot that we're

3    subpoenaing is irrelevant, that's the way it always is when we

4    send out subpoenas or do search warrants.

5           Well, we are looking at the words of the statute and

6    the words of the Fourth Amendment and are making arguments

7    based on that.  The words of the statute, which they just want

8    to blow off, say that what they subpoena, what they go get

9    under a 2703(d) order has to be relevant and material to an

10   ongoing investigation.

11          Imagine if you were sitting in a civil case or a

12   criminal case and somebody comes to you with a Rule 17

13   subpoena and says, we want to subpoena this.  And somebody

14   cites the Nixon case and says, this has got to be relevant and

15   material.  It has to have some evidentiary impact.  You'd say,

16   well, no, you can't go on a fishing expedition under those

17   circumstances.

18          If they want go on a fishing expedition, they should

19   try to do it under a search warrant.  They should try to do it

20   with a subpoena.  There are other remedies and there are other

21   arguments there.  This statute doesn't permit it.

22          The third point is that we seem to agree that the

23   magistrate judge has discretion to deny, narrow, change an

24   order that is sought under 2703(d).

25          They say that the Third Circuit's opinion in that

49

1   regard is wrong, it is going to be turned around, but we all

2   seem to agree that there has got to be some discretion in the

3   Court.  And this goes back to the standing point.  We're

4   making a constitutional challenge.  And what we're saying

5   under--  As we've argued.

6           And they say there is no standing for anything other

7   than a constitutional challenge and, therefore, we can't argue

8   about the statute.

9           Whenever you make a constitutional challenge under

10  the doctrine of constitutional avoidance, if there is some way

11  to solve the case and get rid of the problem legally and

12  properly that doesn't require you to make highfalutin

13  constitutional rulings, then you should do it.  And that's

14  what we're arguing about here.

15          Then the fourth point, on to the Fourth Amendment.

16  They say, don't worry about this, phone records and IP

17  addresses are just the same.  There is a couple of cases,

18  Forrester and Christie, that say so.

19          Well, first, and we've argued this at length in the

20  briefs, I won't go over it again, but let me just point out

21  that Forrester and Christie are cases where what was being

22  argued is you can't come and look at where I go on the

23  Internet.  You know, you go to my computer and what you do is

24  put a register on it and you find out whether or not I go to

25  porn sites or I go to this site or I go to that site.  And,

50

1   therefore, I have an interest in that IP address.

2           We have argued that Forrester is wrong and Christie

3   is inapplicable, but you don't have to go much farther than

4   this to say neither of those cases deal with tracking somebody

5   for a year or six months as they move from computer to

6   computer, communicating with a wide variety of people.  They

7   just--  This is not a case about what Web sites you visited.

8   This is a case about where you were when you made various

9   kinds of speech, political and apolitical, relevant and

10  irrelevant.

11          And the fact that some of this information, or even

12  all of it, could under different, we talked about this before,

13  conceptual circumstances be obtained by a search warrant, a

14  subpoena, visual observation, other investigative means, is

15  simply irrelevant to the question that we're raising.  Which

16  is, is this a search under the Fourth Amendment with all the

17  rules that go with that?

18          And then the final point because you have been

19  listening a long time patiently, and I'm sorry to go so long

20  now, is on the First Amendment.

21          I mean, again, the Government, this is routine.

22  There is no chilling effect they assert.  This is not

23  overbroad.  They just assert.

24          We're not seeking membership lists.  We're saying

25  that you're getting affinity groups.  They say, we're not

51

1   seeking membership lists.  This is argument by assertion about

2   why the First Amendment isn't implicated here.  Don't worry

3   about it, it's routine.

4          And we're rejecting that and arguing exactly the

5   opposite.  An argument by assertion really shouldn't decide

6   this issue.  If there is a First Amendment issue here, which

7   there clearly at least potentially is, and the Court has

8   questions about it or feels the need to reach it, we ought to

9   have a hearing.  We ought to find out what expectations are

10  for purposes of the Fourth Amendment.  We ought to find out

11  about chilling effect for purposes of the First Amendment.  We

12  ought to find out about the Government's need for purposes of

13  the First Amendment balancing.  And so on.

14         They can't simply say, no chilling effect, not

15  overbroad, we're not seeking affinity information, and so on.

16  We're not affecting rights of association.

17         So, unless the Court has questions --

18         THE COURT:  No, thank you.

19         MR. KEKER:  -- that's it.  Thank you, ma'am.

20         THE COURT:  Did you have anything to add, Mr. Fine?

21         MR. FINE:  Yes, Your Honor, briefly.

22         I just want to reiterate that there are two

23  different types of documents that we're seeking to unseal

24  here.  There are judicial orders and there are the

25  applications and any related affidavits.

1          With respect to the other judicial orders to other

2     companies, the Government has failed to explain either in

3     their papers or here today why it is in the best interests of

4     the investigation to reveal the order to Twitter, but that

5     they can't reveal the orders to other companies.  They haven't

6     explained why and they can't explain why.  There is simply no

7     difference.

8          The only potential risk that there could be to

9     unsealing the other orders would be that the public would know

10    who else has received these orders.  But that's simply not a

11    justification for maintaining secrecy.  We have a presumption

12    of open access for a reason.  And just because the public

13    doesn't know certain things is not a sufficient reason.

14         At a minimum, if the Court believes that there is

15    some concern about exposing those third parties, there is a

16    simple solution.  The Court can unseal those other orders and

17    simply redact the company names.  We don't think that's

18    necessary, but that's a clear, less restrictive alternative

19    that the Fourth Circuit has made clear that this Court must

20    adopt if it's present.

21         Second, we're not asking for a right to personal

22    notice of all judicial orders or all applications and

23    affidavits that the Government submits to the Court.

24         What the common law and the First Amendment require

25    is that there be public notice of all judicial records.  And

1    that hasn't occurred here, Your Honor.  And that's not

2    permissible.

3            There simply is not a public docket for each 2703

4    order that the Government has obtained.  There may or may not

5    be notice now of the Twitter order itself, but leave that

6    order aside.  We have got to focus in on all of the other

7    orders.  There is simply no public docket of those other

8    orders.  And the Fourth Circuit has made crystal clear that

9    once matters are sealed, even in time sensitive, otherwise

10   secret proceedings, there has got to be public dockets so that

11   individuals have the right to, so that the public has a right

12   to notice and an opportunity to challenge those sealing

13   orders.  That hasn't happened here and it has to happen.

14           Third, Your Honor, with respect to the affidavits,

15   there are the applications themselves.  The Government has to

16   provide a specific justification to show why in these facts

17   and in these circumstances this particular investigation will

18   be compromised or jeopardized.

19           It is not enough to simply say, the other side

20   doesn't know this information and, therefore, revealing it to

21   them will damage our investigation.

22           Essentially what they're saying is, it will be

23   harmful to our case if the other side knows information.  But

24   that's not how our system works.  You don't get to keep

25   information secret and hidden from the other side just because

1    you don't want to reveal it to them.

2          They have got to provide a specific reason why

3    revealing those facts merits secrecy.  They have got to show,

4    it's going to tip off witnesses, they are going to flee if

5    they know about this information.  That's not present here.

6    The Twitter order has already been unsealed.  So, any of that

7    risk would have already occurred.

8          They have got to show that evidence is going to be

9    destroyed.  Again, they haven't made that argument and they

10   can't make that argument here.

11         With respect to the <u>Media General</u> case that the

12   Government cites, Your Honor, that case is very, very

13   different from this case.  In that case--

14         THE COURT:  I remember it.

15         MR. FINE:  I am sure you do, Your Honor.  I am

16   referring to it by <u>Media General</u>.  In that case everything was

17   publicly available except for the Government's affidavit.

18         Here the Government wants to keep orders secret.

19   That's a very different case, Your Honor.

20         In addition, there was public docketing in that case

21   of every single sealing order.  And thanks to the Court, the

22   Clerk's Office made sure that there was public docketing of

23   everything there, including the sealing order.

24         Here, again, all the other orders to other companies

25   have not been docketed, and that's simply not permissible.

1       And, Your Honor, the Government essentially argues

2  that this is just a routine case and that nothing new is going

3  on here, nothing important is going on here, but this is

4  anything but a routine case.

5       The case law makes clear there is a clear

6  presumption of open access to all judicial documents.  And for

7  the Government to overcome that heavy burden, they have got to

8  show that their interests heavily outweigh the public's

9  interest and movants' interest.  And it's not enough just to

10  assert this general desire to keep information secret and

11  hidden from the other side.

12       They haven't met their specific showing here in

13  these specific facts.  And, therefore, the clear presumption

14  of access should win out and all these documents, both the

15  other orders and the affidavits and applications, should be

16  unsealed, Your Honor.  And at a minimum, they all need to be

17  publicly docketed.

18       THE COURT:  All right, thank you very much.

19       MR. FINE:  Thank you.

20       THE COURT:  Mr. Cummings, they touched on your

21  brief.  Did you need to add any argument?  The Government did.

22       MR. CUMMINGS:  No, I think it is sufficiently stated

23  in there, Your Honor.  Thank you.

24       THE COURT:  Okay.  All right, thank you.

25       Well, everyone did an excellent job in argument, I

1    really appreciate it.  I am going to take it under

2    consideration and issue an opinion.

3           Thank you.

4           MR. KEKER:  Thank you, Your Honor.

5           NOTE:  The hearing concluded at 11:42 a.m.

6    ------------------------------------------------

7

8           C E R T I F I C A T E  of  T R A N S C R I P T I O N

9

10          I hereby certify that the foregoing is a true and

11   accurate transcript that was typed by me from the recording

12   provided by the court.  Any errors or omissions are due to the

13   inability of the undersigned to hear or understand said

14   recording.

15

16          Further, that I am neither counsel for, related to,

17   nor employed by any of the parties to the above-styled action,

18   and that I am not financially or otherwise interested in the

19   outcome of the above-styled action.

20

21

22

23                              /s/ Norman B. Linnell

24                         Norman B. Linnell

25                         Court Reporter - USDC/EDVA