

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C 2703(d) | \| \| \| \| | MISC NO. 10GJ3793<br><br>1:11-DM-00003 |

BRIEF OF ONLINE PRIVACY RESEARCHERS, *PRO SE,*
AS *AMICI CURIAE* IN SUPPORT OF
PETITIONERS' MOTION OF OBJECTION TO MARCH 11, 2011 ORDER DENYING MOTION
TO VACATE AND DENYING IN PART MOTION TO UNSEAL

i

**Table of Contents**

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................................................ 1

SUMMARY OF ARGUMENT ........................................................................................................... 1

RELEVANT FACTS .......................................................................................................................... 2

ACADEMIC STUDIES REVEAL THAT USERS NEITHER READ NOR UNDERSTAND PRIVACY POLICIES ......... 3

STATEMENTS BY GOVERNMENT OFFICIALS CONFIRM THAT USERS DO NOT READ PRIVACY POLICIES .. 6

CONCLUSION ................................................................................................................................ 7

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici* are academics and researchers from the fields of computer science, psychology, and law who focus on online privacy:[1]

- Dr. Kelly Caine, Principal Research Scientist in the Center for Law, Ethics and Applied Research in Health Information and the School of Informatics and Computing, Indiana University
- Danielle Keats Citron, Professor of Law, University of Maryland School of Law
- Dr. Serge Egelman
- Jerry Kang, Professor of Law, UCLA School of Law
- Dr. Aleecia M. McDonald
- Frank A. Pasquale, Schering-Plough Professor in Health Care Regulation and Enforcement, Seton Hall Law School, Visiting Fellow, Princeton University Center for Information Technology Policy
- Len Sassaman, Researcher, Katholieke Universiteit Leuven (Belgium)
- Jason M. Schultz, Assistant Clinical Professor of Law, Director, Samuelson Law, Technology & Public Policy Clinic, UC Berkeley School of Law
- Wendy Seltzer, Associate Research Scholar, Center for Information Technology Policy, Princeton University
- Christopher Soghoian, Graduate Fellow, Center for Applied Cybersecurity Research, Indiana University
- Dr. Michael Zimmer, Assistant Professor, School of Information Studies, Co-Director, Center for Information Policy Research, University of Wisconsin-Milwaukee

No party's counsel authored the brief in whole or in part. No party or a party's counsel contributed money that was intended to fund preparing or submitting the brief. No person—other than the *amici curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

*Amici* urge the court to not dismiss petitioners' Fourth Amendment privacy interests based on their mouse clicks.[2] Research has shown that consumers rarely read and even more rarely understand privacy policies. In fact, the mere presence of a privacy policy is often misunderstood by consumers to mean their privacy is protected. While "clickwrap" acceptance

---

[1] *Amici* submit this brief in their individual capacities. The affiliations listed are for identification purposes only.

[2] Petitioners argue that they have a reasonable expectation of privacy in their IP addresses. *Amici* do not take a position here on this broader issue, but focus solely on the impact that disclosures in privacy policies may have on a person's reasonable expectation of privacy.

1

of terms may constitute a contract under certain circumstances, this legal construct for private obligations has limited bearing on whether a user's expectation of privacy against government intrusion is objectively reasonable and protected by the Fourth Amendment.

## RELEVANT FACTS

In her March 11 order, Magistrate Judge Buchanan rejected petitioners' argument that they had a reasonable expectation of privacy regarding Twitter logs containing their IP addresses:

> In an attempt to distinguish the reasoning of *Smith v. Maryland* and *Bynum*, petitioners contend that Twitter users do not directly, visibly, or knowingly convey their IP addresses to the website, and thus maintain a legitimate privacy interest. This is inaccurate. Before creating a Twitter account, readers are notified that IP addresses are among the kinds of "Log Data" that Twitter collects, transfers and manipulates. See *Warshak*, 2010 (recognizing that internet service providers' notice of intent to monitor subscribers' emails diminishes expectation of privacy). Thus, because petitioners voluntarily conveyed their IP addresses to Twitter as a condition of use, they have no legitimate Fourth Amendment privacy interest.[3]

A footnote below that paragraph added:

> At the hearing, petitioners suggested that they did not read or understand Twitter's Privacy Policy, such that any conveyance of IP addresses to Twitter was involuntary. This is unpersuasive. Internet users are bound by the terms of click-through agreements made online. *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 544 F.Supp.2d 473,480 (E.D. Va. 2008) (finding a valid "clickwrap" contract where users clicked "I Agree" to acknowledge their acceptance of the terms), *aff'd A.V. ex rel v. iParadigms, LLC*, F.3d 630, 645 n.8 (4th Cir. 2009). By clicking on "create my account", petitioners consented to Twitter's terms of use in a binding "clickwrap" agreement to turn over to Twitter their IP addresses and more.[4]

The order summarized that "[b]efore creating a Twitter account, readers are notified that IP addresses are among the kinds of 'Log Data' that Twitter collects, transfers and manipulates."[5]

The nature of the notification, however, rendered it far from effective.

When consumers sign up for a Twitter account, they are shown a copy of the over 200 line Terms of Service in a text box which displays five lines of text at a time. Users are not required

---

[3] *In re § 2703(d) Order*, 10GJ3793., 2011 WL 900120, at 13 (E.D. Va. Mar. 11, 2011).
[4] *Id* at n.6.
[5] *Id* at 13.

2

to scroll to the bottom or click a check box acknowledging that they have read the terms. Instead, immediately above the clickable "Create My Account" button is the following line of text:

> By clicking on "Create my account" below, you are agreeing to the Terms of Service above and the Privacy Policy.

The Twitter Terms of Service, obscured as they are, do not include any mention of IP addresses. Instead, it is Twitter's Privacy Policy that includes the relevant disclosure, in the sixth paragraph. It is entirely possible, if not likely, that petitioners never clicked the link to and never saw Twitter's privacy policy.

While these facts are but one of many considerations in determining the existence of a contract (such as the "clickwrap" cases cited in the Magistrate's order), they are central to a Fourth Amendment analysis. A reasonable expectation of privacy under the Fourth Amendment depends in part upon whether the expectation is "one that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U. S. 347, 361 (1967). *Amici* respectfully submit that, given the research and scholarship discussed below, Twitter's privacy policy has negligible bearing on whether plaintiffs held an objectively reasonable expectation of privacy in their account records.

## ACADEMIC STUDIES REVEAL THAT USERS NEITHER READ NOR UNDERSTAND PRIVACY POLICIES

The view that Internet users are on "fair notice" regarding practices disclosed in privacy policies and terms of service is misguided. Most users never read these terms, or read and understand only limited portions of them.

Courts and academics continue to debate the extent to which and under what circumstances terms of use and privacy policies should be enforced as a matter of regular civil contract law.[6] Among the thorny issues that are presented by such cases are whether the user receives adequate actual or constructive notice of the terms, whether the user effectively consents and whether the terms are unconscionable. Whatever the merits of recognizing private, civil contract obligations and remedies arising from such standard terms, however, they provide little basis for reducing a person's reasonable expectations of privacy under the Fourth Amendment.

Many legal commentators recognize that few consumers actually take the time to read and understand digital terms of service agreements before saying they agree to them.[7] Similarly, a

---

[6]*See, e.g.,* Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 462–63, 475–76 (2006) (citing cases and noting differences in enforceability between corporate-entity defendants and individuals).
[7]*See* Robert L. Oakley, *Fairness in Electronic Contracting: Minimum Standards for Non-Negotiated Contracts*, 42 Hous. L. Rev. 1041, 1051 (2005) ("Clickwrap licenses are ubiquitous today, and most

growing body of empirical research confirms that consumers ignore terms of services, end user license agreements, and privacy policies online.

A study conducted by researchers at New York University in 2007 observed the Internet browsing behavior of over 45,000 web users. The researchers found that "only one or two out of every thousand retail software shoppers chooses to access the license agreement, and those few that do spend too little time, on average, to have read more than a small portion of the license text."[8]

A survey of more than 2000 people by Harris Interactive in 2001 found that more than 60 percent of consumers said they had either "spent little or no time looking at websites' privacy policies" or "glanced through websites' privacy policies, but... rarely read them in depth." Of those individuals surveyed, only 3 percent said that "most of the time, I carefully read the privacy policies of the websites I visit."[9]

Among 222 study participants of the 2007 Golden Bear Omnibus Survey, the Samuelson Clinic at the University of California, Berkeley found that only 1.4 percent reported reading end user license agreements (EULAs) often and thoroughly, while 66.2 percent admitted to rarely reading or browsing the contents of EULAs, and 7.7 percent indicated that they had not noticed these agreements in the past or had never read them.[10] An earlier study by a researcher at the University of California, Berkeley found that the majority of users ignored the EULA entirely when installing such popular software as Google Toolbar on their home computers.[11]

---

people click to accept without reading the text."); Robert A. Hillman & Jeffrey J. Rachlinski, *Standard-Form Contracting in the Electronic Age*, 77 N.Y.U. L. Rev. 429, 429-31 (2002) ("with increasing alacrity, people agree to terms [in clickwrap contracts] by clicking away at electronic standard forms on web sites and while installing software."); Michael I. Meyerson, *The Reunification of Contract Law: The Objective Theory of Consumer Form Contracts*, 47 U. Miami L. Rev. 1263, 1269 & nn.28–29 (1993) (citing cases recognizing the failure of most consumers to read form contracts); See also Ting v. AT & T, 182 F. Supp. 2d 902, 930 (N.D. Cal. 2002) (holding a customer service agreement procedurally unconscionable because lack of notice contributed to surprise, the court acknowledged that "AT&T's own research found that only 30% of its customers would actually read the entire CSA [consumer service agreement] and 10% of its customers would not read it at all").

[8]Yannis Bakos, Florencia Marotta-Wurgler & David R. Trossen, *Does Anyone Read the Fine Print? Testing a Law and Economics Approach to Standard Form Contracts* (N.Y.U. Law & Economics Research Paper No. 09-40, October 6, 2009), available at http://ssrn.com/abstract=1443256.

[9]http://www.ftc.gov/bcp/workshops/glb/supporting/harris%20results.pdf

[10]Joseph Turow et al., *The Federal Trade Commission and Consumer Privacy in the Coming Decade*, 3 I/S: J.L. & Pol'y for Info. Soc'y 723, 740 (2007) available at http://www.ntia.doc.gov/comments/100402174-0175-01/attachments/FTC_and_privacy.pdf.

[11]Nathaniel Good et al., Commentary, *User Choices and Regret: Understanding Users' Decision Process About Consensually Acquired Spyware*, 2 I/S: J.L. & Pol'y for Info. Soc'y 283, 321 (2006).

4

In a commercial context, one software firm inserted a clause into its EULA offering the discoverer $1,000.[12] It took five months and over 3,000 purchasers before a user claimed the prize.

However, while the vast majority of consumers don't read privacy policies, many do notice the presence of a privacy policy on a company's website. Unfortunately, most Americans incorrectly believe that the phrase privacy policy signifies that their information will be kept private. A 2003 survey by the Annenberg School for Communication at University of Pennsylvania found that 57 percent of 1,200 adults who were using the Internet at home agreed or agreed strongly with the statement "[w]hen a web site has a privacy policy, I know that the site will not share my information with other websites or companies." Two years later, 59 percent of 1,200 people asked said the same statement was true.[13]

If consumers were interested in reading privacy policies, doing so would likely take a significant amount of their time. A research team at Carnegie Mellon University calculated the time to read the privacy policies of the sites used by the average consumer, and determined that:

> [R]eading privacy policies carry costs in time of approximately 201 hours a year, worth about $2,949 annually per American Internet user. Nationally, if Americans were to read online privacy policies word–for–word, we estimate the value of time lost as about $652 billion annually.[14]

Finally, even if consumers took the time to try to read privacy policies, it is quite likely that many would not be capable of understanding them. Most website terms of service and privacy policies, like other formal contracts, are long, poorly organized, and written in impenetrable legalese.[15] Such contracts are often written at a level of difficulty that exceeds the ability of most consumers to understand.[16] In 2004, a team of researchers analyzed the content of the privacy policies of 64 popular websites and calculated the reading comprehension skills that a reader would need to understand them. Their research revealed that:

> Of the 64 policies examined, only four (6%) were accessible to the 28.3% of the Internet population with less than or equal to a high school education. Thirty-five policies (54%)

---

[12] Larry Magid, *It Pays To Read License Agreements (2005)*, available at http://techtalk.pcpitstop.com/2009/12/14/4-years-later-pc-pitstop-eula-experiment-still-the-buzz/

[13] Joseph Turrow, Deirdre K. Mulligan and Chris Jay Hofnagle, Research Report: *Consumers Fundamentally Misunderstand The Online Advertising Marketplace* (2007), available at http://groups.ischool.berkeley.edu/samuelsonclinic/files/annenberg_samuelson_advertising.pdf

[14] Aleecia McDonald and Lorrie Cranor, *The Cost of Reading Privacy Policies*, 4 I/S: J.L. & Pol'y for Info. Soc'y (2008) available at http://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf

[15] See Robert W. Gomulkiewicz, *Getting Serious About User-Friendly Mass Market Licensing for Software*, 12 Geo. Mason L. Rev. 687, 692–94, 701–02 (2004).

[16] See Alan M. White & Cathy Lesser Mansfield, *Literacy and Contract*, 13 Stan. L. Rev. 233, 235–42 (2002).

5

were beyond the grasp of 56.6% of the Internet population, requiring the equivalent of more than fourteen years of education. Eight policies (13%) were beyond the grasp of 85.4% of the Internet population, requiring the equivalent of a postgraduate education. Overall, a large segment of the population can only reasonably be expected to understand a small fragment of the policies posted.[17]

## STATEMENTS BY GOVERNMENT OFFICIALS CONFIRM THAT USERS DO NOT READ PRIVACY POLICIES

In addition to the large body of academic research confirming that users do not read privacy policies, several senior government officials have acknowledged these findings in public statements.

During his introductory remarks at a privacy round table event in December 2009, Federal Trade Commission (FTC) Chairman Jon Leibowitz told those assembled in the room that:

> "We all agree that consumers don't read privacy policies – or EULAs, for that matter."[18]

Similarly, in an August 2009 interview, David Vladeck, the Director of the FTC's Bureau of Consumer Protection told the New York Times that:

> "Disclosures are now written by lawyers, they're 17 pages long. I don't think they're written principally to communicate information; they're written defensively. I'm a lawyer, I've been practicing law for 33 years. I can't figure out what the hell these consents mean anymore. *And I don't believe that most consumers either read them, or, if they read them, really understand it.* Second of all, consent in the face of these kinds of quote disclosures, I'm not sure that consent really reflects a volitional, knowing act."[19] (emphasis added).

Even the Chief Justice of the US Supreme Court has weighed in on the issue. While speaking in Buffalo, NY last year, Chief Justice Roberts answered a student question by admitting he doesn't usually read the terms of service or privacy policies, according to the Associated Press:

---

[17]Carlos Jensen and Colin Potts, Privacy policies as decision-making tools: an evaluation of online privacy notices. In Proceedings of the SIGCHI conference on Human factors in computing systems (CHI '04). ACM, New York, NY, USA, 471-478 (2004), *available at* http://lib.zstu.edu.cn/res_base/lib_com_www/upload/article/file/2010_3/7_12/f4ywgbiwtpjn.pdf.
[18]Jon Leibowitz, Chairman, Fed. Trade. Comm'n, Introductory Remarks at the FTC Privacy Roundtable (Dec. 7, 2009) *available at* http://www.ftc.gov/speeches/leibowitz/091207privacyremarks.pdf.
[19]An Interview with David Vladeck of the F.T.C. (Aug. 5, 2009), http://mediadecoder.blogs.nytimes.com/2009/08/05/an-interview-with-david-vladeck-of-the-ftc/.

It has "the smallest type you can imagine and you unfold it like a map," he said. "It is a problem," he added, "because the legal system obviously is to blame for that." Providing too much information defeats the purpose of disclosure, since no one reads it, he said. "What the answer is," he said, "I don't know."[20]

## CONCLUSION

Academic studies as well as statements by senior officials at the Federal Trade Commission and the Chief Justice of the Supreme Court confirm that consumers do not read privacy policies.

*Amici* urge the court not to dismiss petitioners' Fourth Amendment privacy interests based on petitioners' "clickwrap" consent to Twitter's Privacy Policy. The research highlighted above demonstrates that most consumers do not read privacy policies, and often would not understand them if they did. In fact, the mere presence of a privacy policy is often misunderstood by consumers to mean their privacy is protected. While "clickwrap" consent to a privacy policy may create a contract, it makes little sense to allow obscure boilerplate agreements to determine the existence of a reasonable expectation of privacy under the Fourth Amendment.

Dated: March 28, 2011

By: *[signature]*
Christopher Soghoian (*pro se*)

Graduate Fellow,
Center for Applied Cybersecurity Research
Indiana University

PO Box 2266
Washington, DC 20013
Telephone: 617-308-6368
Email: chris@soghoian.net

---

[20] Debra Cassens Weiss, Chief Justice Roberts Admits He Doesn't Read the Computer Fine Print (Oct. 20, 2010), http://www.abajournal.com/weekly/article/chief_justice_roberts_admits_he_doesnt_read_the_computer_fine_print.